## MERRITT & BOURNE v. JUDD & BYRNE.

A FIXTURE is an article of a personal nature annexed to the freehold, and may exist on public land.

In this State, claims to public mineral lands are recognized as titles—as legal estates of freehold, for all practical purposes—if we except some doctrine of abandonment not, perhaps, applicable to such estates.

A steam engine and boiler, fastened to a frame of timber, bedded in the ground of a quartz ledge sufficient to make it level, with a roof or shed to protect the machinery, and used for the purpose of working the ledge, are so annexed to the freehold as to become a fixture.

Such machinery, when applied to quartz leads, is a *trade fixture*, removable by the tenant, if otherwise entitled to remove it.

But this removal can only be during the tenancy, and during such further period of possession by the tenant as he holds *the premises under a right still to consider himself a tenant*, and not during the time he may actually hold possession after his lease has expired.

This right of removal by the tenant may be regulated by agreement between the parties, and, possibly, by implication, from the custom of a particular district.

Such machinery, so fixed, is included by the phrase in the lease, "improvements that may be put up on the ground for working the lead." And where the lease stipulated that the improvements should go to the lessor on termination of the lease, if the rent was not paid, or if the lessee declined to purchase, as per the lease he might, the lessor's right to the fixtures is not destroyed by the tenant contracting, subsequently, to buy, and taking a bond for title on payment of the purchase money, but failing to fulfill his bond.

A renewal of a lease terminates the tenant's right to remove fixtures. So with any other agreement which terminates possession under a lease.

Although a lessor of land cannot, in a given case, claim the fixtures, it is otherwise of the mortgagee of the lessee. Here the question is between grantor and grantee, and the latter holds all fixtures, whether for trade or manufacture, agriculture or habitation.

A general deed of mortgage, or bargain and sale, passes the fixtures as part of the freehold.

At common law, a bond for title is in effect a mortgage. The legal title remains in the vendor, and an equity vests in the vendee, to have the title on compliance with the conditions. The legal title, as also the equity, goes to the whole estate, and includes fixtures. The vendor can bring ejectment on breach of condition, or foreclose.

APPEAL from the Fourteenth District.

The facts are sufficiently stated in the opinion. The Court below, on motion for nonsuit, and during the trial, made rulings upon the doctrine of fixtures, the opposite of the results reached by this Court, and it is not necessary to repeat them. The jury, under instructions, found for plaintiff. Defendants appeal.

*F. J. Dunn*, for Appellant.

1. Taking the contracts together, Whigham did not comply with the terms of the first or last, and lost all claim to the property in dispute, and hence could not transfer any title to McKee. Nor could McKee, or his vendees, Merritt & Bourne, obtain the property without making the contract between Whigham and Byrne good. (*Von Schmidt* v. *Huntington*, 1 Cal. 55; *Tewksbury* v. *Laffan*, Id. 129; *Michel* v. *Sanchez*, Id. 200; *Osborn* v. *Elliot*, Id. 337; *Fowler* v. *Smith*, 2 Id. 568; *Green* v. *Wells*, Id. 584; *Jones* v. *Post & Co.*; *Violet* v. *Patten*, 6 Cranch, 142, 150; *Powell* v. *Brown*, 3 John. 100; *Townley* v. *Sumrall*, 2 Pet. 182.)

2. Things erected for the personal convenience of the tenant, which are personal in their nature, as a cider mill to be used during the tenancy, are not fixtures. But the case here is different. The object in erecting the engine, pumps, and boiler, was permanent. They were affixed to the soil, and hence were fixtures. (*Vaness* v. *Picard*, 2 Pet. 137; *Phillipson* v. *Wallampley*, 1 Mis. 620; *The Union Bank* v. *Emerson*, 15 Mass. 159; *Dispatch Line of Packets* v. *Bellamey*, *Mann & Co.* 12 N. H. 205; *Winslow* v. *Merchants' Insurance Co.* 4 Met. 306; *Preston* v. *Briggs*, 16 Vt. 124; *Beers* v. *St. John*, 16 Com. 322; *Degroff* v. *Scruggs*, 4 Hemp. 431; *McDaniel* v. *Moodey*, 3 Stewart, 314; *Bratton* v. *Clanson*, 2 Strab. 478; *Sparks* v. *State Bank*, 7 Black. 469; *Truble* v. *Fuller*, 28 Maine, 545; 16 Id. 115.)

*McConnell & Niles,* for Respondents.

1. There cannot be a fixture to a quartz claim upon public land. The term "fixture" originally signified an article personal in its nature, but affixed to the freehold, and, by reason of this connection, it could not be removed against the owner of the inheritance. It now means the opposite, to wit: A chattel affixed to the freehold, but removable as against the owner of the inheritance. (Arch. Land. and Ten. 358; 2 Kent, 344, 345; 2 Steph. Com. 260; 2 Smith's Lead. Cases, 114; Amos & Ferard on Fix. 1.)

As between the landlord, who is the owner of the freehold, and the tenant, the rule is, that during his term the tenant may remove fixtures erected or placed by himself. But if he suffer them to remain fixed after his tenancy expires, and he quits the possession of the land, he cannot enter to remove them.

But it is the owner of the freehold estate in the land alone, who can claim the right to retain fixtures as against the tenant after the expiration of the tenancy.

Byrne was not the owner of any freehold estate in the land upon which the engine and pump in controversy were placed. He had at most a mere occupancy of the soil attendant upon his freehold in the franchise. He owned a quartz claim only— a right to take and appropriate the mineral contained in the limits of his claim. The Federal Government owns the soil. The miner's right is derived from the State, and cannot be larger than the right of the State.

2. The pump and engine were personal property, and not fixtures in any sense of the word. Such property, in the mines, is purchased and sold, and moved from place to place, and from shaft to shaft, as other personal property.

Personal property of this nature, even if much more permanently attached to the freehold than this appears to have 'been, would not lose its character of personal property, and become a fixture. (*Lawton* v. *Lawton,* 3 Atkyn, 13; *Lord Dudley* v. *Lord Warde,* 1 Amb. 113; *Elwes* v. *Mawe,* 3 East, 38; 2 Kent's Com. 345; *King* v. *The Inhabitants of Otley,* 1 Barn. & Adol. 161; *Wausbrough* v. *Maton,* 4 Adolph. & Ellis, 884; *Heermance* v. *Vernoy,* 6 Johns. 5; *Holmes* v. *Tremper,* 20 Id. 30; *Farrar* v. *Chauffetete,* 5 Denio, 529; *Vanderpoel* v. *Van Allen,* 10 Barb. 157, reviewing all

the cases; *Gale* v. *Ward*, 14 Mass. 354; *Taylor* v. *Townsend*, 8 Id. 412.) The engine and pump were not essential to the use of the quartz claim. (*Fitzherbert* v. *Shaw*, 1 H. Black. 259; 2 Kent's Com. 343, *et seq.*; and, also, to Smith's Leading Cases, 114, *et seq.* where the entire subject is fully discussed in the notes to *Elwes* v. *Mawe*.)

3. Whigham, remaining in possession through his tenant, Mc-Kee, after the expiration of his lease under the covenant from Byrne, to convey to him on certain conditions, was entitled to notice to quit. (*Right ex dem. Lewis* v. *Beard*, 13 East, 210; 1 Wheat's Selwyn, 722.) And Byrne's entry was unlawful. Hence Whigham's term had not expired, and either he or his assignee, could remove the engine and pump, even if they were fixtures. (*Penton* v. *Robart*, 2 East, 88.)

BALDWIN, J. delivered the opinion of the Court—TERRY, C. J. concurring.

Replevin for a small steam engine and pump.

This case has been argued with a research and ability highly creditable to the counsel, the more especially as their labors and arguments are of a value somewhat disproportioned to that of the matter of litigation which has elicited them. The facts, as stated by Respondents, are as follows: R. S. Whigham, the plaintiffs' predecessor in interest, leased a quartz ledge of the defendant, Byrne. During the lease, Whigham placed the engine and pump upon the ledge, where it was used to pump water from the shaft, and to raise the quartz rock to the surface. The lease expired on the 1st September, 1856, and, on the next day, Byrne gave to Whigham a bond for a deed on certain payments to be thereafter made by Whigham. Whigham continued in possession under this contract. On the 1st January afterwards, Whigham, being still in possession of the ledge, sold the pump and engine, together with other property, to Redick McKee, and gave him possession, with the knowledge of Byrne. McKee worked the ledge under Whigham, and from that time it lay idle, the quartz not paying.

Some time after the sale by Whigham to McKee, Byrne entered and took possession of the pump and engine, and removed them, under protest by McKee's agent. He then leased them

Merritt v. Judd.

to defendant, Judd, who was also present, and took part in the removal of the property, and was then notified of the claim of McKee. At the time of the commencement of the suit, the engine and pump were in possession of Judd, under this lease from Byrne.

Whigham failed to comply fully with the conditions of his purchase of the lead, having made part payments only of the purchase money.

The engine and pump were attached in the following manner: Two timbers, ten or twelve feet long, and from two feet to thirty inches in diameter, were placed side by side upon the ground; they were only bedded in the ground sufficiently to make them level. On these bed timbers were placed a frame of four timbers, each about eight inches in diameter, the side timbers about seven feet long, and the end ones about three feet. These frame timbers were bolted or spiked together, and bolted or spiked to the bed logs. The boiler of the engine was spiked or bolted to this frame. The engine rested on the frame beside the boiler. The boiler, engine, and pump, were attached together by the usual connections, the pump itself extending into the shaft. Over the whole was a roof or shed, which was constructed merely for the protection or shelter of the machinery. The machinery was not attached to the building in any way, except that the pump was stayed by rods, reaching to the rafters of the roof.

McKee sold the pump and engine to the plaintiffs.

The quartz lead was upon the public lands, and was within the limits of a pre-emption claim owned by Whigham.

The main question raised by this state of facts is, was this property a fixture in the common law sense; and if so, had the plaintiffs, the tenants, a right to remove it? and this question depends upon two inquiries: 1. Whether there can be a fixture on public land; and, 2. Whether if there can be, the particular facts here constitute the property such, and give the right of removal claimed by Respondents?

1. It is contended by the counsel for the Respondents, that there can be no such thing as a fixture upon public land.

Fixtures are variously defined—though the writers substantially agree at this day in the general definition. Kent defines

Merritt *v.* Judd.

it to be "an article of a personal nature affixed to the freehold."
(2 Com. 344.) In Smith's Leading Cases, (vol. 2, p. 296,) an elab-
orate essay is found upon the subject. The author, after criti-
cising the definition given in several English cases, says : " It
seems better, therefore, for the purposes of this note, to use the
word 'fixture' in that which appears to be its natural and most
obvious sense, viz: anything annexed to the freehold. By the ex-
pression, 'annexed to the freehold,' is meant, fastened to, or con-
nected with, it; mere juxtaposition, or the laying of an object,
however heavy, on the freehold, does not amount to annexa-
tion."

We are not disposed to agree with this first proposition of the
counsel. From an early period of our State jurisprudence, we
have regarded these claims to public mineral lands, as titles.
They are so practically. It is very evident that the government
will not change its policy in respect to them—that they will not
be sold, nor the present tenure altered. Our Courts have given
them the recognition of legal estates of freehold, and so, to all
practical purposes—if we except some doctrine of abandonment,
not, perhaps, applicable to such estates—unquestionably they
are, and we think it would not be in harmony with this gen-
eral judicial system to deny to them the incidents of freehold
estates in respect to this matter. If to decide thus, be a de-
parture from some technical rules of law, it is but following
other rules, which hold that a system of decisions, long estab-
lished and long acted upon, shall not be departed from when
important rights have vested under it, merely because the rea-
sons upon which it rests might not, in the judgment of subse-
quent Judges, be considered sound. We can see no difference
in respect to the principle between a house built upon public
land, and a fixture; the reason which makes the one a part of
the inheritance, applies to the other, and it is only by deny-
ing to the vendee, or *quasi* owner, the character of owner, that
the legal conclusion can be escaped, that the title to the land,
whatever it is, carries with it the title to the structures annexed
to the soil.

2. We come to consider the next question, whether the prop-
erty as we have described it, was a part of the freehold. It
must be annexed to the soil. Thus, in the case of *Culling* v.

*Tuffnall,* (Buller's N. P. 34,) where a tenant had erected a barn on pattens and blocks of timbers lying on the ground, but not fixed in or to the ground, it was held he might take them away at the end of his term. The author of Smith's Leading Cases, after reviewing a number of precedents, says : "The general rule is, that to constitute an article a fixture—*i. e.* a part of the realty—it must be actually annexed thereto, and, *e converso,* whatever is so annexed becomes part of the realty, and the person who was the owner of it when a chattel, loses his property in it, which immediately vests in the owner of the soil." The authorities make a distinction in this right of removal, as between persons differently related—that is, as between heir and executor, between executor and remainderman, and between landlord and tenant. As, however, this question is rested here on this last relation, we need not consider the rules governing the others. The author, (Smith,) says, that "the general rule governing this subject, is, that the tenant, if he have annexed anything to the freehold during his term, cannot again remove it without the consent of his landlord. (Co. Lit. 53 a.") After the passage of the statute of Gloucester, (for the punishment of waste by the tenant,) it was held that a lessee engaged in trade, and who had set up fixtures for carrying it on advantageously, had, in some cases, a right to remove them at the expiration of the term. This was, at length, firmly settled in *Poole's Case,* (1 Salk. 368,) and has been since supported by many cases. The benefit of this rule was applied to a fire-engine, erected under a shed, and which could not be removed without considerable injury to the freehold, to a shed built on brick work, (1 H. Black. 258,) and to posts and rails.

Upon few subjects have there been more numerous or more diverse decisions than upon this question of fixtures. Though no great difficulty appears at first sight in the definition itself, yet the application to particular facts has vexed the Courts and given rise to an endless conflict of decision. This subject is reviewed by Mr. Justice Cowen, in the case of *Walker* v. *Sherman,* (20 Wend. 638,) in his usual exhaustive style. The learned Judge draws the distinction between the rights of landlord and tenant, and grantor and grantee—to which we shall have occasion to advert hereafter. Among the cases reviewed is that of

the *Olympic Theater*, (2 Browne. 285,) in which the Court say : " The general rule appears to be, that where the instrument or utensil is an accessory to anything of a personal nature, as to the carrying on a trade, it is considered a chattel ; but where it is a necessary accessory to the enjoyment of the inheritance, it is to be considered as a part of the inheritance."

Lord Mansfield took a similar view of the question in *Lawton* v. *Salmon*, (1 H. B. 259.) " The present case," said he, " is very strong. The salt spring is a valuable inheritance ; but no profit arises from it unless there is a salt-work, which consists of a building for the purpose of containing the pans, which are fixed to the ground. The inheritance cannot be enjoyed without them. They are accessories necessary to the use and enjoyment of the principal. The owner erected them for the benefit of the inheritance." These salt pans were very slightly fixed with mortar to the floor, and might be removed without injuring the building. The same eminent Judge held that a steelyard hung in a machine-house was a fixture, (*Rex* v. *Inh. of St. Nicholas*, Gloucester, 262,) " the principal purpose of the house was for weighing." Dane, in the third volume of his Abridgment, 156, says the articles referred to before " are very properly a part of the real estate and inheritance, and pass with it, because not the mere fixing and fastening to it is alone to be regarded, but the use, nature, and intention." Mr. Justice Weston delivered an opinion in *Farrar* v. *Stackpole*, (6 Greenl. 157,) which Mr. C. J. Gibson, of Pennsylvania, strongly commends. Judge Weston says : " The genius and enterprise of the last half century has been in nothing more remarkable than in the employment of some of the great agents of nature, by means of machinery, to an infinite variety of purposes for the saving of human labor. Hence, there has arisen in our country a multitude of establishments for working in cotton, wool, wood, iron, and marble ; some under the denomination of mills, and others of factories, propelled generally by water power, but sometimes by steam. These establishments have, in many instances, perhaps in most, acquired a general name, which is understood to embrace all these essential parts ; not only the building which shelters, incloses, and secures, the machinery, but the machinery itself. Much of it might be easily detached, without injury to the re-

maining parts, or to the building, but it would be a very narrow construction, which should exclude it from passing by the general name by which the establishment is known, whether of mill or factory. The general principle of law must be applied to new kinds of property, as they spring into existence in the progress of society, according to their nature and incidents, and the common sense of the community. The law will take notice of the mutations of language, and of the meaning of new terms, applied to new subjects, as they arise. In other words, it will understand words used by parties in their contracts, whether executed or executory, whether in relation to real or personal estate, according to their ordinary meaning or acceptation."

The same principle is held and enforced with great power, by C. J. Gibson, in the case of *Voorhis* v. *Freeman*, (2 Watts & Serg. 116,) a case entitled to the more consideration from the frank acknowledgment made of the error of a previous contrary decision of the Supreme Court of Pennsylvania, in which that eminent jurist participated.

Mr. Justice Cowen, after reviewing a multitude of authorities, English and American, reaches this conclusion :

" On the whole, I collect from the cases cited, and others, that as a general rule, in order to come within the operation of a deed conveying the freehold, whether by metes and bounds of a plantation, farm, or lot, etc. or in terms denoting a mill or factory, etc. nothing of a nature personal in itself will pass, unless it be brought within the denomination of a fixture by being in some way permanently, at least habitually, attached to the land or some building on it. It need not be constantly fastened. It need not be so fixed that detaching will disturb the earth or any part of the building. I am not prepared to deny that a machine moveable in itself would become a fixture from being connected in its operations by bands, or in any other way, with the permanent machinery, though it might be detached and restored to its ordinary place as easily as the chain in *Farrar* v. *Stackpole*."

We think that the principle to be extracted from the modern cases covers the case at bar; that this apparatus was necessary to the working of the ledge; that it was attached for that purpose permanently to the soil, and its use accessory, if not essential, to the inheritance for its only valuable purpose—the extrac-

tion of the gold.    Many cases are cited in the books, in which a similar, or not more intimate and secure, connection with the freehold has been held a sufficient annexation.    Some cases have been noticed already.    See, further, *Farris* v. *Walker*, (1 Bailey, S. C.) where a cotton gin attached to the gears in a gin house upon a cotton plantation, was held a fixture passing with the land.    See, also, to same effect, *McDaniel* v. *Moody*, (3 Stew. 314.)    A steam engine, with its fixtures, used to drive a bark mill and pounders.    (*Oves* v. *Oglesby*, 7 Watts, 106; *Voorhis* v. *Freeman*, 2 Watts & S. 116; Id. 390; 7 Blackf. 469.)    Iron stoves fixed to the brickwork of the chimneys of a house, (7 Mass. 482,) gravestones erected, (4 N. H. 415,) the mill-chain, clogs, and bars, being in their appropriate places at the time of conveyance, pass with a saw-mill and appurtenances.    (*Farrar* v. *Stackpole*, 6 Greenl. 154.)    (See, also, for similar examples, *Union Bank* v. *Emerson*, 15 Mass. 159 ; *Dispatch Line* v. *Bellamey*, 12 N. H. 233; *Noble* v. *Bosworth*, 19 Pick. 314 ; 3 Mason, 459 ; 4 Watts, 330 ; 2 Dev. 376 ; 3 Missouri, 307 ; 5 Cow. 323.)

The Respondents' counsel insists that after the expiration of the lease, the tenant may remove the fixtures, and cites two authorities, (20 Johns. 29, and *Pemberton* v. *King*, 2 Dev. N. C. 376.)    But in the first case the question did not arise, for the cider mill in controversy there was held to be no fixture at all. We have not had access to 2 Dev. it not being in the library; but, if the doctrine there be as stated, it is directly opposed to an overwhelming weight of authority.    (See *The State* v. *Elliott*, 11 N. H. 542; 2 Kent's Com. 346; *Lee* v. *Risdon*, 7 Taunt. 183; *Lyde* v. *Russell*, 1 Barn. & Adol. 394, before cited ; *White* v. *Arnt*, 1 Whart. 91; *Gaffield* v. *Hapgood*, 17 Pick. 192; *Shepherd* v. *Paulding*, 4 Met. 416; Chitty on Con. 322; *Fitzherbert* v. *Shaw*, 1 H. Bl. 258,) all of which maintain the contrary doctrine.

It is observed in the review by the learned editor of the Leading Cases that, to whatever extent the right to remove trade fixtures be carried, common sense and justice seem to require that it should be bounded by the rule laid down by Lord Hardwick in *Lawton* v. *Lawton*, that the principal thing shall not be destroyed by the accessory.    The authorities seem to be divided as to the right of a farmer to remove fixtures annexed to the soil, and put there for agricultural purposes; but in several

cases it is held that when the tenant's business is in the nature of a trade, (as in 3 East, which involved the right to a cider mill,) the same rule held. But the right, in respect to these fixtures, it seems to be conceded, is less broad than the right to trading fixtures. However, this makes no difference here, for we consider this sort of property—being movable in its nature—when applied to quartz leads, is really used in trade—the trade of getting out the gold—or as accessory to that business. We can see no distinction in this respect between this sort of property used for this business and the same property used for the purpose of a colliery.

Though this property, according to the cases cited, was a fixture, still it was removable by the tenant, if he were otherwise entitled to remove it. To this conclusion, however, the objection just noticed is interposed, that there is no right of removal except during the tenancy; and that this had ceased at the time of the severance and removal. In *Penton* v. *Hobart*, (2 East, 88,) Lord Kenyon stated the rule to be, that, after the termination of the lease, the tenant, *if he remained in possession*, had a right to take away fixtures, which he might have removed during his term. The reason is stated: "He was, in fact, still in possession of the premises at the time when the things were taken away, and, therefore, there is no pretense to say that he had abandoned his right to them." If the fact of leaving the premises be only important as proving abandonment, and the forfeiture of the right to the fixtures depends upon the presumed abandonment, it would seem that the retention of the premises by the tenant, although à considerable period may have elapsed after the termination of the lease, would preserve his right. But this doctrine seems qualified in a subsequent case of *Weston* v. *Woodcock*, in which Alderson, B. said: "The rule to be collected from the several cases decided on this subject seems to be this, that the tenant's right to remove fixtures continues during his original term, and during such further period of possession by him, as he holds *the premises under a right still to consider himself a tenant;*" and we have seen that beyond this, the great weight of authority does not go.

It has been seen that the lease is evidenced by an article of agreement dated the 21st of April, 1856. It leases to Whigham

Merritt v. Judd.

the ledge for three months, commencing on the first day of June, and ending on the first day of September, for three hundred dollars per month. On failure to pay the rental as provided, (six days grace being given,) the lessee to forfeit all improvements on the ground. Lessee binds himself to work the ledge in a good and workmanlike manner for the term. The article then provides that the lessee, on the expiration of the lease, shall have the privilege of buying the property on certain terms and conditions, after the expiration of the lease. " If the party of the second part does not see proper to purchase at the expiration of his lease, then he shall deliver up said premises, with improvements on the ground, or that may be put on the ground, for working the lead, peaceably to the said Byrne, his heirs, or assigns."

It has been seen that the lessee did purchase. The paper evidencing this fact, is in form a bond, under a penalty of ten thousand dollars. The condition of the bond recites that, whereas, the obligor has sold to Whigham the lead, etc. for five thousand dollars : One thousand dollars 10th October, 1856; two thousand dollars 20th December, 1856; two thousand dollars 1st February, 1857; upon which payments, well and truly to be made in manner and form aforesaid, he binds himself to make a title, etc. to the ledge, and every part thereof, and every right thereto.

It is admitted that the purchase money was not paid; and it seems that the plaintiff did not himself retain the possession, nor did his vendee, but that sometime before the removal of this property, the defendant resumed the possession and leased it to other parties, who also occupied and subsequently abandoned the premises.

Whatever may be the right of the tenant by mere force of his relation and the law to remove a fixture, there is no doubt that this right may be regulated by the agreement or undertaking of the parties. So it is laid down in the Leading Cases, 212, and *Naylor* v. *Collinge*, 1 Taunt. 19; *Perry* v. *Brown*, 2 Stark. 403; *Thrasher* v. *East London Water Works Co.* 2 B. & C. 608; *Earl of Mansfield* v. *Blackburn*, 5 Brigh. 426; and several other cases are cited and maintain the principle. The author intimates that such a stipulation may be created by implication from the custom

of a particular district. In *Fairburn* v. *Eastwood*, (6 Meeson & W. 677,) the lease contained a covenant that the fixtures should be valued to the landlord at the end of the tenancy. The tenant became bankrupt, and the landlord, to whom the premises had been given up, refused to pay the amount of the valuation to the assignees; it was held they might maintain trover for the fixtures. The case appears to have proceeded on the principle, that as the landlord, by the terms of the covenant, was entitled to the possession of the fixtures, on condition of his paying for them, it would have been inconsistent with the stipulation to hold that he could retain them after breaking that condition. The case was, therefore, one in which the ordinary rule was qualified by express agreement.

*West* v. *Blakenay*, (2 Mann. & G. 729, side,) is a case interpreting the words " erection and improvements " in a lease. It was held, among other things, that a green-house was included in the term "improvement," and that the covenant was broken by the removal by the tenant of the sashes and framework of the green-house, erected during the term, the framework of which was laid upon walls built for the purpose of receiving it, and embedded in mortar thereon.

We cannot doubt that the improvements mentioned in the lease include this property; the " improvements that may be put up on the ground for working the lead," seem to have direct reference—they certainly include—this machinery, thus fixed in, or to, the soil.

It has been seen that the lease stipulates that these shall go to the lessor on the termination of the lease, if the rent was not paid; also, that if the lessee declined to purchase, the same effect was to follow. Could it have been intended, if he failed to pay, —if he only went through the form of a contract to pay—the lessor's rights would be less? Was that the agreement?

4. But another principle comes into the case here. It was held in *Fitzherbert* v. *Shaw*, (1 H. B. 258,) that where the lease is renewed, the lessor's right to carry away the fixtures is gone. Upon the execution of the new lease, he is in the same situation as if the landlord, being seized of the land, had leased both land and fixtures to him. Nor does this doctrine apply only to a lease, but to other agreements which terminate a possession un-

der it. (*Lyde* v. *Russell*, 1 Barn. & Adol. 394,) is a leading case, and is said to have been very maturely considered by Lord Tenterden. The case was trover for bells, pulls, cranks, wires, etc. The doctrine was held that the tenant must remove the fixtures during the continuance of the term, and not having done so, they belonged to the landlord. The landlord, after the tenant had quitted, severed these fixtures from the freehold, and converted them into chattels. Chitty on Cont. 316, says: "With respect to the transfer of fixtures, it appears to be a rule that upon the conveyance of lands and houses, purchased in general terms, personal chattels attached thereto are impliedly included, although such chattels might otherwise be taken away under the law of fixtures, and that the grantee cannot, after such general conveyance, insist on a valuation of the fixtures. 2 B. & C. 6; 3 D. & R. 355, are cited by the author. And so, where a lease is renewed, containing the general terms "land," "buildings," "erections," etc. fixtures are included as part of the demise, and the tenant cannot afterwards remove them, whatever may have been his right before the new lease was granted. (*Thresher* v. *East London Water Works Co.* 2 B. & C. 669; S. C. 4 D. & R. 62.)

In 2 Sandf. Ch. 364, the distinction is recognized between the right of lessee and that of a mortgagor. Although, says the Court, the lessor of the land could not claim the fixtures, it is otherwise of the mortgagee of the lessees. The question here is between grantor and grantee, in which case the grantee holds all fixtures, whether for trade or manufacture, or for the purposes of agriculture or habitation, and *Walker* v. *Sherman*, (20 Wend. 636,) and the authorities there cited are referred to as sustaining, and they do sustain fully, the proposition.

There is no doubt, that, under a general deed of mortgage, or bargain and sale, the fixtures pass as a part of the freehold. In *Winslow* v. *Merchants' Insurance Co.* (4 Met. 306,) it is held that, as between the mortgagor and mortgagee, fixtures for trade cannot be removed by mortgagor, though put up by mortgagor after the execution of the mortgage.

Applying these principles to the case at bar: If the lessee had renewed his lease, he would not have been entitled to remove the improvements. Is he in any better situation under this executory contract of sale? And this brings us to inquire what

is the nature of the contract? It did not vest a title, that is certain; for it only stipulated for a title on a certain condition and in a given event. It is what is called in other States a bond for title. These instruments have been often construed. They are in effect mortgages at common law. The legal title is retained by the vendor, and an equity vests in the vendee to have the legal title, on compliance with the conditions. This legal title is to the whole estate, including the fixtures, and this equity is to the same extent. The vendor can go into equity to foreclose, or he can bring ejectment on breach of condition. (See 5 Port. 452, and cases therein; also, 5 S. & M. Miss. R. 594; 4 John. Ch. 559; 5 Id. 193; 1 Id. 370.)

But we have already seen that a new agreement in respect to the premises by the lessee, destroys his right to the fixtures. (See cases before cited.) The lease was terminated long before the removal of this property, and after an abandonment of the premises after there was an entry, and a right of entry by the landlord who held the legal title; and within the case of *Lyde* v. *Russell*, before cited, this right to remove was gone, and the title from these latter facts, alone vested in the owner of the estate.

These views lead us to the conclusion that the Court below erred in its rulings both on the motion for nonsuit and on the trial.

Judgment reversed and cause remanded.