[No. C002267. Third Dist. Aug. 11, 1988.]

C. R. FEDRICK, INC., Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

COUNSEL

John K. Van de Kamp, Attorney General, Robert F. Tyler, John D. Schell and Charles Kobayashi, Deputy Attorneys General, for Defendant and Appellant.

Jack D. Paulson for Plaintiff and Respondent.

OPINION

BLEASE, J.—The State Board of Equalization (Board) appeals from a judgment granting a recovery of sales taxes as having been erroneously collected (Rev. & Tax. Code, § 6933). The matter arises out of a contract between C. R. Fedrick, Inc. (Fedrick), and the United States for modification of facilities for separation and distribution of petroleum and natural gas extracted at the Naval Petroleum Reserve No. 1, Elk Hills, California. The question is whether or not property Fedrick purchased for use in the performance of the contract is subject to sales tax under Revenue and Taxation Code section 6384. Section 6384 provides that purchases of prop-

erty so used are subject to the tax if the contract is "for the construction of improvements on or to real property in this state." The Board contends that the trial court erred in finding the purchases outside the scope of section 6384. We agree.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 1981, Fedrick contracted for the approximate sum of $18.5 million to perform the following work: "GENERAL DESCRIPTION— The work consists of modification of 32 existing Stevens Zone tank setting facilities, the installation of three new gage settings and connecting well flow lines, a new common oil surge facility with vapor recovery compressors, a new low pressure gas gathering compressor plant, Shallow Zone Gas field collection piping, Zero Pressure Casing Gas field collection piping, and a Zero Pressure Casing gas compressor facility. This project is sub-divided into two construction phases. The first phase shall include modifications to the 16 eastern tank settings, installation of three new gage settings with connecting well flow lines, a new oil surge facility with vapor recovery compressors in the Northern R area, a new low pressure gas gathering compressor plant. Shallow Zone Gas field collection piping. Zero Pressure Casing field collection piping and Zero Pressure Casing Gas compressor facility. The second phase will be limited to modification of the 16 western tank settings. For exact list of modified tank settings, see Section 01100-30, paragraph 24 of this specification. The work comprises furnishing all materials, their handling, transportation, installation, assembly, alignment, testing and check out of equipment, instruments, and piping as defined by these Specifications and accompanying Drawings. The work includes the furnishing of new oil, gas and hydrocarbon condensate piping in the new areas and the installation of loop lines paralleling certain of the existing lines serving modified locations. Government-Furnished Materials listed in this section consists of existing equipment and new long delivery materials and equipment such as the compressors, pumps, separators, and part of instruments for the first four of the tank settings to be modified. The work includes transportation, installation, assembly, alignment, testing and check out of the new and surplus equipment and instruments and the furnishing of necessary materials to install this Government-Furnished Material as complete and operable systems. Work to be done by others is also listed in this section." Change orders resulted in final compensation to Fedrick in an amount exceeding $23 million. The amount of tax which Fedrick claims was erroneously collected is $302,359.38.

The tank setting facilities are collection facilities for the output of a number of oil wells. The output of the wells is piped as much as a mile to the tank setting where gas is separated from oil. The gas is then routed to

processing plants for processing and sale or is recirculated to the oil wells to assist in the production of more oil. The oil is stored in a holding tank and later pumped to a central location from half a mile to 12 miles away for further processing. Fedrick installed new pipelines from the wells to the tank settings. At the tank settings are various components or vessels connected by pipes for processing, storing, and pumping. Most components were installed by placing them on concrete foundations in which bolts are embedded. These bolts are similar in nature to those used to bolt a house to its foundation. The components are then fastened by means of nuts or nuts and clips. Some of the foundations were poured by Fedrick and some were in existence already.

Charles Fedrick, the president of Fedrick, described the work at the tank settings as follows: "Oh, well we take 32 facilities what were existing, we came in and we removed the facilities and set them off to the side, demolished them. And then we reinstalled portions of the old facilities and actually some of the vessels were stayed [sic] right in place. And then we added vessels and changed all new piping and all new valves and instrumentation and separators and then tied in the system into the gas wells coming as well as running lines from the gas wells into them." Fedrick also installed some components from the oil field's "surplus yard." In addition to installation of components, Fedrick "brought electricity" to the sites and converted pumps from gasoline power to electricity.

The largest components of the tank settings are 500- to 1,000-barrel tanks. The testimony at trial was that all such tanks were actually supplied by the United States rather than by Fedrick. The contract specifications had called for Fedrick to furnish two 1,000-barrel tanks.

Everything that was installed that is a subject of this lawsuit is readily removable as units. The various components or vessels are connected to the pipes by flanges. The flange consists of two trumpet-shaped segments presenting matching disks with holes which are bolted together sandwiching a gasket between them. One side is connected to the component, the other is welded to the piping. Flanges allow easy disconnection of the components. However, as a practical matter, flanges would be the means of coupling whether the installation were permanent or temporary.

Fedrick removed quite a bit of pipe. This is accomplished by cutting the pipe with a cutting torch or unbolting a flange. The same procedure could be used to relocate pipe. The pipe sections running from well to pump setting and from pump setting to the central location are welded together. These pipe runs lie on wooden sleepers like railroad ties. The ties are staked into the ground with steel stakes that project a couple of feet into the

ground. The stakes project above the sleepers and help keep the pipe from slipping off of the sleepers. At some points pipelines cross underneath roads. Where this occurs the pipe is normally inside of a larger piece so that the interior pipe could be removed at any time. The pipe is unpainted. The area is arid and an unpainted pipe could last 40 years without rusting out. Charles Fedrick opined that removal of the pipe would damage neither the pipe nor the realty.

Fedrick also completed two new compressor stations. A compressor station is necesssary to transport gas to the central location where it is refined. The compressors "usually" come in about three pieces to facilitate lifting for weight and are mounted on skids. They sit on concrete slabs and are attached to the concrete by anchor bolts.

The Elk Hills reserve is approximately 90 square miles in area. There are perhaps 200 tank settings. Charles Fedrick testified that wells run dry and new wells are employed at Elk Hills all the time. Consequently, tank settings are moved "at all times." He guessed that part of a tank setting might be moved once a week at the reserve. He further guessed that one entire tank setting might be moved once each year. However, he conceded that some tank settings would not be moved for years and had no idea how long the tank settings modified under the contract had been in place prior to modification. He thought that five years was the point when an oil well "tails off." However, when asked what the longest time of production was he replied he was not an expert at it.

Spencer Stallings, a Board tax auditor, testified as follows. He had been employed by Superior Oil Company while attending college. As a result of his employments, he was familiar with the function of tank settings and the relationship of tank settings to other components of an oil production and distribution system. The tank settings at which he worked while at Superior Oil Company had been in place for 40 years. The first well discovered at Elk Hills in the 1920's is still in production.

Stallings had audited a subsequent contract for further modification of the tank settings in issue in this lawsuit. Each identifiable piece of property at Elk Hills is assigned a unit number and a record is kept of its location. As of January 1986, none of the components installed by Fedrick had been moved. "The locator card indicates they were placed in one location and they have remained at that location."

The trial court took the matter under submission and thereafter issued a minute order ruling in favor of Fedrick. The Board requested a statement of decision. The court issued a statement of decision explaining its ruling

essentially as follows. Fedrick established by a preponderance of the evidence that the sales were of machinery and equipment as defined in title 18 California Code of Regulations section 1521 (former Administrative Code). The sales tax does not apply to such sales. The property in question was not an improvement to realty for the following reasons: "1. The property in question was not annexed to the real property in a manner which would make it an improvement to realty in that it was not installed in specially constructed buildings or affixed in a permanent manner. [¶] 2. Its adaptability to the realty on which it was installed was inconsistent with making an improvement. [¶] 3. The intention of the party installing the property in question was not to annex it in a permanent manner as evidenced by the fact that all of the property was located above ground, was not weather proofed, was attached by clips which were readily removable or was not attached at all as in the case of pipe lying on sleepers, or tanks resting on gravel pads and was *not* intended to remain in place for an indefinite period of time."

## DISCUSSION

The Board contends that the trial court erred in finding that the challenged transaction is not taxable. As appears, the central questions are (1) whether the pipe used by Fedrick is material used in construction of an improvement to real property and (2) whether the tank settings and compressor facilities are fixtures as a matter of law on the evidence presented. The answer to both questions is yes. There is no *material* contradiction in the evidence at trial. The issue is one of the applicability of the provisions of Revenue and Taxation Code section 6384 to the uncontradicted facts. This presents a question of law and we are not bound by the findings of the trial court as to its resolution. (See e.g., *San Diego T. & S. Bank* v. *San Diego* (1940) 16 Cal.2d 142, 153 [105 P.2d 94, 133 A.L.R. 416].)

Both the Board and Fedrick come at the problem by immediate consideration of the Board's regulation, title 18 California Code of Regulations section 1521 (hereafter rule 1521), which addresses the problem and upon which the trial court focused in concluding the property here is not part of an improvement. While the regulation is—obviously—pertinent, it must be read against the statutory backdrop. Accordingly, we turn our attention first to the statutory plane.

## I

Revenue and Taxation Code section 6384 is as follows: "Notwithstanding any other provision of law the tax imposed under this part shall apply to the gross receipts from the sale of any tangible personal property to contractors purchasing such property either as the agents of the United States or for

their own account and subsequent resale to the United States for use in the performance of contracts with the United States for the construction of improvements on or to real property in this state."

Section 6384 is an exception to an exception; a neighboring statute, section 6381, exempts from sales tax the sale of property to the United States. (*C.R. Fedrick, Inc.* v. *State Bd. of Equalization* (1974) 38 Cal.App.3d 385, 396 [120 Cal.Rptr. 434].) These companion statutes are explicable against the backdrop of developments in the law of intergovernmental immunity applicable to state taxation of federal government activities. (*Id.,* at pp. 394-395; also see e.g. Annot., State Sales or Use Tax as Violating Immunity of United States—Supreme Court Cases (1976) 44 L.Ed.2d 719; Annot. (1942) 140 A.L.R. 621.)

Originally, the federal case law broadly proscribed sales taxes whose economic burden would ultimately be borne by the federal government. (See e.g., *Panhandle Oil Co.* v. *Mississippi* ex rel. *Knox* (1928) 277 U.S. 218 [72 L.Ed. 857, 48 S.Ct. 451, 56 A.L.R. 583].) However, in November 1941, the United States Supreme Court upheld application of a sales tax to lumber purchased by a contractor for use in constructing an army camp for the United States, in *Alabama* v. *King & Boozer* (1941) 314 U.S. 1 [86 L.Ed. 3, 62 S.Ct. 43, 140 A.L.R. 615]. Revenue and Taxation Code section 6384, enacted in June 1941, inferably anticipated this decision. The enactment may also have been spurred by the enactment of the Buck Act in 1940 (Act of Oct. 9, 1940, ch. 787, 54 Stat. 1059, codified by Act of July 30, 1947, § 105 et seq. 61 Stat. 644) which waived exclusive territorial jurisdiction over federal enclaves as an impediment to state sales or use taxes. (See *United States* v. *Mississippi Tax Comm'n.* (1975) 421 U.S. 599 [44 L.Ed.2d 404, 95 S.Ct. 1872].)

It has been suggested that section 6384 may have been premised upon a legislative perception that improvements to realty would be permissible under the Buck Act because the property would presumably remain in the state. (*C.R. Fedrick, supra,* 38 Cal.App.3d at p. 395.) A more plausible rationale is that if the material were used in the performance of a contract to construct an improvement the incidence of the tax could be more easily justified as one on the activities of the construction contractor rather than directly upon the United States. (See *Alabama* v. *King & Boozer, supra,* 314 U.S. at pp. 8-9 [86 L.Ed. at p. 6]: "So far as such a nondiscriminatory state tax *upon the contractor* enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties." Italics added; compare *Kern-Limerick, Inc.* v. *Scurlock* (1953) 347 U.S. 110 [98 L.Ed 546, 74 S.Ct. 403].) Use of goods in constructing an improvement to realty is more easily

viewed as *consumption by the contractor*. However, where goods are simply transferred to the federal government for use as personalty, even though "installed" on its realty the incidence of the sales tax seems to fall more directly upon the federal government.

The application of section 6384 turns on the meaning of the term "improvements." There is no statutory definition of the term "improvements" in the division of the Revenue and Taxation Code pertaining to sales tax. However, that term is defined in the division of the code pertaining to property tax. Revenue and Taxation Code section 105, in pertinent part is as follows: " 'Improvements' includes: (a) All buildings, structures, fixtures, and fences erected on or affixed to the land. . . ." As appears, Fedrick impliedly argues that the definition of "improvements" in section 6384 is narrower than the definition of that term in section 105. *Why* this should be so is left entirely unaccounted for by Fedrick.

## II

That brings us to the Board's regulation, rule 1521. The rule provides in essence as follows. Persons who make "construction contracts" with the United States are the "consumers of materials and fixtures which they furnish and install in the performance of [such] contracts." (Subds. (a)(3) and (b)(1)(A).) However, such persons are "retailers of machinery and equipment furnished in connection with the performance of [such contracts]." (Subd. (b)(1)(B).) A "construction contract" is a contract to construct, alter, or repair any improvement to real property. (Subd. (a)(1)(A).)

" 'Machinery and equipment' means and includes property intended to be used in the production, manufacturing or processing of tangible personal property, the performance of services or for other purposes (e.g., research, testing, experimentation) not essential to the fixed works, building, or structure itself, but which property incidentally may, on account of its nature, be attached to the realty without losing its identity as a particular piece of machinery or equipment and, if attached, is readily removable without damage to the unit or to the realty. 'Machinery and equipment' does not include junction boxes, switches, conduit and wiring, or valves, pipes, and tubing incorporated into fixed works, buildings, or other structures, whether or not such items are used solely or partially in connection with the operation of machinery and equipment, nor does it include items of tangible personal property such as power shovels, cranes, trucks, and hand or power tools used to perform the construction contract. A list of typical items regarded as machinery and equipment together with a list of typical items not regarded as machinery and equipment is set forth in Appendix C." (Subd. (a)(6).) Appendix C lists, as things which are not machinery and

equipment, inter alia, "Fixtures and materials as defined in this regulation. . . ." " 'Fixtures' means and includes items which are accessory to a building or other structure and do not lose their identity as accessories when installed. A list of typical items regarded as fixtures is set forth in Appendix B." (Subd. (a)(5).) A list of "fixed works" includes "gas transmission and distribution systems, pipelines and other systems for the transmission of petroleum and other liquid or gaseous substances, refineries and chemical plants . . . ." (Subd. (a)(1)(A)2.) Included in the list of examples of "materials" in the regulation are, "Piping, valves, and pipe fittings." (Appen. A.)

## III

The initial question arising from the rule is whether the definition of "machinery and equipment" includes property that would count as "fixtures" under real property law or the law of property tax. Fedrick argues that property that would count as "fixtures" in the law of real property or property tax may nonetheless count as "machinery and equipment" hence not as "improvements" under the sales tax law, specifically under the governing statute, section 6384. The argument is not persuasive. It finds no compelling support in the text of the regulation and the case law upon which Fedrick relies is not apposite. The purpose of the governing statute, section 6384, would be disserved by such a narrow construction of the overarching term "improvements."

Fedrick relies upon *United States Lines, Inc.* v. *State Bd. of Equalization* (1986) 182 Cal.App.3d 529 [227 Cal.Rptr. 347]. In that case United States Lines, Inc., erected two cranes on the land of the Port of Oakland and sold the cranes to the port in exchange for a long-term lease back of the cranes at nominal consideration. United States Lines sought to avoid the payment of sales tax on the theory that at the time of the sale the cranes were affixed to real property, hence, they could not count as tangible personal property which is the subject of sales tax. The court rejected this effort to evade the application of the tax by altering the form and timing of the transaction. "U.S. Lines's myopic focus on the stipulated real property character of the cranes for purposes of local tax assessment and property tax payment on its possessory interest overlooks the fact that classification of affixed equipment as real property 'fixtures' for property taxation purposes does not preclude classification of the same equipment as tangible personal property for sales tax purposes." (*Id.,* at p. 535.)

*U.S. Lines, Inc.* relies heavily upon the reasoning of this court in *King* v. *State Bd. of Equalization* (1972) 22 Cal.App.3d 1006 [99 Cal.Rptr. 802]. In that case we rejected a claim by the Board that a contractor who installed

an electric power transmission line should pay sales tax measured by the value of the cost of both goods used to construct the line and the labor costs involved in fabrication. The Board argued that the transmission line should be considered tangible personal property because the predecessor to Revenue and Taxation Code section 105 expressly excluded telephone and telegraph lines from "improvements" subject to property tax. The taxpayer argued that the transmission line was real property or an improvement to real property, hence, the labor costs of fabrication could not be used as a measure of a sale of tangible personal property. We rejected the Board's argument reasoning as follows. "Like many tax statutes, the sales tax law employs relatively artificial, relatively self-contained, concepts. If it utilizes popular meaning or concepts from other fields of law, it does so only by force of its own objectives and definitions. It does not define real property or 'improvements' to real property, if only because it makes little use of these terms. Its definition of tangible personal property deals with tangibility, not with distinctions between personalty and realty. To pursue the will-o'-the-wisp of definitions, concepts and distinctions from other areas of law— where they are shaped by purposes and by social and economic factors unrelated to sales taxation—leads to false goals. The coverage of the sales tax law is shaped by its own provisions and definitions and, where these are unclear, by applying its own perceived policies and concepts. (See Davis, *The Purposive Approach to the Interpretation of Sales Tax Statutes* (1966) 27 Ohio St.L.J. 429) [¶] Neither section 3617 of former Political Code nor its statutory successor, section 105, bears any designed relationship to the Sales and Use Tax Law. The former antedated the Retail Sales Tax Act of 1933 by many decades. Currently section 105 is found in that division of the Revenue and Taxation Code dealing with property taxation. Section 101 declares that such definitions govern in the construction of that division. We pointed out in *Standard Oil Co.* v. *State Bd. of Equal., supra,* 232 Cal.App.2d at pages 99-100, that the Legislature has not directed application of the ad valorem tax definitions to the field of sales taxation. The courts have often declared that definitions evolved for property tax purposes have no necessary conformity with definitions for other purposes." (*King, supra,* 22 Cal.App.3d at pp. 1010-1011; fns. omitted.)

We also relied upon the Board's regulation at issue in this case, rule 1521. "Rule 1521 defines a construction contract as one for creating a *building or other structure on land,* but not one for the sale and installation of machinery and equipment. It divides the personal property going into construction jobs into two categories: first, *materials,* that is, various kinds of tangible personal property which in combination lose their identity and become an integral part of the completed structure; second, *fixtures,* which become an accessory to the building and do not lose their identity when placed or installed. In effect, Rule 1521 classifies the contractor as a consumer of

*materials* who must pay a sales tax on his purchases: classifies him as a retailer of *fixtures,* who must charge his customer a tax measured by the retail selling price which, in the case of a lump sum contract, is the cost price of the fixture to the contractor.

"[¶] . . . In terms of economic impact, Rule 1521 imposes upon the contractor the cost of the retail sales tax on *materials.* In practice, this cost is shifted to the project owner as part of the contract price. As to fixtures, the contractor (in his role as retailer) must pay the sales tax and collect it from the project owner. The contractor neither pays nor collects a sales tax measured by the cost of labor to incorporate *materials* into the structure or to install *fixtures.* The retail sales tax law ultimately imposes upon the project owner the dual economic burden created by the sales taxes on materials and fixtures going into the job, but not that of a tax base expanded by charges for construction labor and installation labor. The board would here expand the tax base by including in it the contractor's outlays for labor. The transaction in suit was nothing other than a contract for construction of a "structure on land" within the meaning of Rule 1521. Hence the contractor's labor charges were no part of the tax base." (*King, supra,* 22 Cal.App.3d at pp. 1013-1014.)

Neither *U.S. Lines, Inc.* nor *King* provides Fedrick with persuasive support in this case. As *King* notes, one must be wary of false cognates; if sales tax law utilizes popular meaning or concepts from other fields of law it does so by force of its own objectives. However, in this case, unlike *King,* sales tax law has made explicit use of the term "improvements" in the particular context in issue. While it does not necessarily follow that the term has the same content as that set forth in Revenue and Taxation Code section 105, neither does it follow that the meaning of the term is different because it appears in a sales tax statute. We are given no reason to suppose that the usage is different. The Legislature sought to render taxable the sale of goods for use in constructing improvements to realty owned by the United States. There is no apparent economic or policy reason why the measure of an improvement as to which tax would be payable should be narrower in section 6384 than in section 105. In default of another candidate for a definition we are impelled so to read "improvements." (Cf., *San Diego T. & S. Bank* v. *San Diego, supra,* 16 Cal.2d at p. 147.)

The situation here is the mirror image of *U.S. Lines, Inc.* That case and *King, supra,* stand for the proposition that the character of property may be viewed differently for purposes of sales tax and property tax, *in the hands of different persons.* The reason for this differentiation is to avoid the evasion of the respective taxes by different persons if they were permitted to insist upon a unitary characterization. If we accept Fedrick's argument we will

allow some to evade the operation of the sales tax who, under commonly accepted definitions, install fixtures that would be viewed as realty in the hands of the landowner. In section 6384 the term "improvements," employed for the purpose of taxing the tangible personal property which is consumed in the construction of the "improvements," looks to the character of the property in the hands of the landowner. Accordingly, we construe the term "machinery and equipment" as used in rule 1521 as excluding fixtures within the meaning of that term under section 105. Indeed, this was the position of the trial court in its statement of decision. The trial court explicitly adverted to cases concerning the definition of a fixture under the law of property taxation. It is those cases to which we next turn.

## IV

As noted by the trial court the classic formulation of the test of "fixtures" is set out in *San Diego T. & S. Bank* v. *San Diego, supra,* 16 Cal.2d 142. The question in that case was whether vault doors of a bank were realty for purposes of taxation. (*Id.,* at p. 145.) The court concluded that the answer was yes, commencing its analysis with the following observation: "we must apply the three tests which have often been used by this court in determining whether or not an article is a fixture—namely: (1) the manner of its annexation; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation." (*Id.,* at p. 149.)

The first two components weighed in favor of a finding that the vault door was a fixture. "It is undisputed that the vault doors in question are affixed to the realty in a manner to bring them within the class of fixtures as defined in the Civil Code. (Sec. 660.) [¶] Without the stipulation that vault doors were adaptable to the banking purposes for which the plaintiffs herein were using the land and buildings, it is apparent that they are useful and necessary thereto. The fact that vault doors play a prominent part in the protection of the moneys and valuables which are entrusted to a bank for safe keeping, as one of its main functions, is too obvious to require further mention." (16 Cal.App.3d at p. 149)

The more difficult problem was the intent of the party making the annexation. Civil Code section 660 in pertinent part is as follows. "A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws . . . ."

Hence, the intention of interest is that of permanence. As to that problem the court made the following salient observations. "The nature of a vault door itself suggests an intent permanently to affix it to a vault which by ordinary tests must be said to constitute an improvement to realty. Vaults alone without doors would not be useful as vaults, and would fail in their intended purpose. Both functionally and physically a vault door is integrated with the vault itself. Certainly vaults and vault doors constitute a unit for use together and are improvements to the realty. . . .

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

[¶] The mere fact that said doors can be removed without material damage to the vaults by chipping away with a chisel, jack hammer, or compressed air hammer, the cement grouting which attaches them to the vaults, does not alone establish their character as articles of personalty. A door or window in an ordinary dwelling house can be removed with very little damage to the realty. It also may be replaced by one of different design or by a new one if the former should become broken or defective, but no one would contend that either was not a part of the realty by reason of these facts alone. [¶] The existence or period of use of a vault door is measured by the life of the building to which it is annexed unless it becomes obsolete or mechanically defective. In order to make an article a permanent accession to the land its annexation need not be perpetual. It is sufficient if the article shall appear to be intended to remain where fastened until worn out, until the purpose to which the realty is devoted has been accomplished or until the article is superseded by another article more suitable for the purpose. (26 C.J. 657, sec. 6.) [¶] The vault doors here in question vary in original cost from $1800 to $20,000. Their resale value was testified to be but 25 per cent of that original cost. The monetary loss involved in a continuous and frequent replacement of such doors would negative the fact that their removal and replacement was intended to be a very common occurrence. [¶] The size of the vault doors and the resultant expense and inconvenience in moving and replacing them also rebuts the proposition that their installation was intended to be a mere temporary thing. The record shows that the doors may vary in weight from three to forty tons. It also reveals that such removals and replacements are in fact infrequent—one witness testified that he had replaced but two in twenty-nine years. Although there was other testimony that replacements were made more often, still, as a whole, it revealed they were not an every day, an every year, or an every two or three year occurrence. The removals appeared to have taken place most often in cases of obsolescence, mechanical defect or discontinuance of the owner in the banking business. [¶] None of these factors taken alone might establish the annexor's intent permanently to affix the vault doors to

the realty, but, viewed together in their entirety, we are unable to perceive that any other intention can be inferred therefrom." (*San Diego T. & S. Savings Bank* v. *County of San Diego, supra,* 16 Cal.2d at pp. 150-152.)

The tests of *San Diego Trust & Savings Bank* are reiterated in *Simms* v. *County of Los Angeles* (1950) 35 Cal.2d 303, 309 [217 P.2d 936]. The reiteration is followed immediately by the remark that, "It is also settled that for tax purposes the 'intention' must be determined by the physical facts or reasonably manifested outward appearances without regard to the annexor's status as landlord or tenant." (*Ibid.*) The issue in *Simms* was whether the failure to tax as realty "certain articles, machinery and equipment installed in buildings for purposes of trade, commercial or industrial uses" rendered taxation of bank vault doors as realty discriminatory. (*Id.,* at pp. 307-308.) The court concludes that these other articles had been misclassified as personal property. (*Id.,* at 309.) It rejected an attempt to distinguish vault doors from the other articles.

"Defendants argue, however, that a distinction may be made between articles which are 'integral parts' of a building or a 'unit for use' therewith on the one hand and trade fixtures generally on the other, and that only property in the former category need be classified as improvements for tax purposes. The nature or basis of the asserted distinction is not clearly indicated, but we infer from the briefs that the argument has reference to articles installed in buildings of special design and construction or attached in a manner rendering their severance impossible without injury as contrasted with articles attached in a manner from which the conclusion of permanence is ordinarily not so compelling. (*Cf.,* Civ. Code, § 1019.) It is also urged that a reasonable classification of fixtures may be made as a matter of law on the basis of the nature of the business involved, the argument in this regard being that stability and permanence of location is present to a greater extent in the banking business than in manufacturing and industry generally." (*Simms* v. *County of Los Angeles, supra,* 35 Cal.2d at p. 309.)

The court rejected this proffered distinction, ". . . the applicable statutes do not permit of the division of trade fixtures into classes or of the distinctions contended for by defendants, and on the contrary require all fixtures or trade fixtures to be taxed as improvements." (35 Cal.2d at p. 310.)

In *Merritt* v. *Judd* (1859) 14 Cal. 59 the question arose whether a steam engine and boiler fastened to a timber frame (bedded in the ground of a quartz ledge sufficiently to level the frame) was a fixture. The Supreme Court reviewed the authorities, quoting the following passage from an unidentified work of Mr. Justice Cowan. " 'On the whole, I collect from the cases cited, and others, that as a general rule, in order to come within the

operation of a deed conveying the freehold, whether by metes and bounds of a plantation, farm, or lot, etc. or in terms denoting a mill or factory, etc. nothing in a nature personal in itself will pass, unless it be brought within the denomination of a fixture by being in some way permanently, at least habitually, attached to the land or some building on it. It need not be constantly fastened. It need not be so fixed that detaching will disturb the earth or any part of the building. I am not prepared to deny that a machine movable in itself would become a fixture from being connected in its operations by bands, or in any other way, with the permanent machinery, though it might be detached and restored to its ordinary place as easily as the chain in *Farrar* v. *Stackpole.*' " (*Merritt, supra,* 14 Cal. at p. 67.) The *Merritt* opinion then concluded as follows. "We think that the principle to be extracted from the modern cases covers the case at bar; that this apparatus was necessary to the working of the ledge; that it was attached for that purpose permanently to the soil, and its use accessory, if not essential, to the inheritance for its only valuable purpose—the extraction of the gold. Many cases are cited in the books, in which a similar, or not more intimate and secure, connection with the freehold has been held a sufficient annexation. Some cases have been noticed already. See, further, *Farris* v. *Walker,* (1 Bailey, S.C.) where a cotton gin attached to the gears in a gin house upon a cotton plantation, was held a fixture passing with the land. See, also, to the same effect, *McDaniel* v. *Moody,* (3 Stew. 314.) A steam engine, with its fixtures, used to drive a bark mill and pounders. (*Oves* v. *Oglesby,* 7 Watts, 106; *Voorhis* v. *Freeman,* 2 Watts & S. 116; Id. 390; 7 Blackf. 469.) Iron stoves fixed to the brickwork of the chimneys of a house, (7 Mass. 482,) gravestones erected, (4 N.H. 415) the mill-chain, clogs, and bars, being in their appropriate places at the time of conveyance, pass with a saw-mill and appurtenances. (*Farrar* v. *Stackpole,* 6 Greenl. 154.)" (*Id.,* at pp. 67-68.)

## V

We apply this case law and rule 1521 to the facts of the case at hand. Here the testimony and photographs introduced into evidence of the tank settings, pipelines, and compressor stations compel the conclusion that the work performed by Fedrick is an "improvement" and that the various components are "materials" and "fixtures."[1]

Just as with the vault doors, it cannot be disputed that the manner of attachment to the land, bolting to concrete foundations embedded in the soil, or bolting to components so attached, is within the physical means of attachment enumerated in Civil Code section 660. The fact that components

---

[1] We include copies of two such photographs of the tank settings installed by Fedrick as an appendix to this opinion.

could be "easily" disassembled and removed and the pipe "easily" cut and transported does not alone establish their character as personalty any more than the showing that the vault doors could be removed without material damage. Similarly, it is indisputable that the facilities constructed by Fedrick were adapted to the use and purpose for which the realty is used. The configuration and placement of the various components was governed by the situs and conditions of the various wells in the oil field, and all of the apparatus was accessory to the use of land for its only apparent valuable purpose—the extraction of oil and gas.

The question is whether the evidence that fluctuations in the production characteristics of the wells caused occasional relocation of components of the setting tanks and might, once a year or so, cause an entire setting tank facility to be relocated sufficiently detracts from the objective indications of permanency to allow the conclusion that the components are not "materials" and "fixtures" and the facilities not improvements. This evidence will not warrant such a conclusion.

Assuming that one tank setting were relocated each year, the chance of any facility constructed by Fedrick being moved in five years is one in forty. At this rate in three out of four cases the setting will be unmoved in fifty years. The minor relocation of components also does not appear to present a high probability of frequent movement since as the Attorney General notes there are apparently thousands of components in the field of which one may be moved in any week or so.

The tank settings that Fedrick *modified* had been in place for some significant period of time. This supports the inference of permanency. The cost of fabrication of the facilities under the contract substantially exceeds the costs of the goods that were used to accomplish that fabrication. There was no testimony that Fedrick reused any of the pipe that had been employed in the existing facilities it remodeled. If an oil field containing facilities such as those in issue here were sold it is implausible to suppose that the facilities would not pass as realty to the new owner.

Under rule 1521 the principal means of distinction of "fixtures" and "materials" from "machinery and equipment" is by use of lists of examples. The list of items typically regarded as machinery and equipment and items not so regarded is as follows. Machinery and equipment includes: "Drill presses, Electric generators (un-affixed, or, if affixed, which meet the requirements of [the definition of machinery and equipment]; Lathes, Machine tools, [and] Printing presses." We note that the items which are listed in the rule as machinery and equipment are all stand alone, self-contained units (save for power supply) used in manufacturing, which in their opera-

tion are not ordinarily integrated structurally with other units. In that respect they are dissimilar to the items here in issue. Machinery and equipment does not include: "Fixtures and materials as defined in this regulation [¶] Wiring, piping, etc., used as a source of power, water, etc., for machinery and equipment [¶] Radio transmission antennas [¶] Large tanks (i.e., over 500 barrel capacity) [¶] Fire alarm systems [¶] Street light standards [¶] Cooling towers other than small prefabricated cooling units." (Rule 1521, App. C.)

We are offered no reason why the piping used as a source of gas and petroleum for the components of setting tanks and compressor units should count as "machinery and equipment" in view of the rule. Rule 1521 lists "Piping, valves, and pipe fittings" as "typical items regarded as materials . . . ." (*Id.,* Appen. A.) The pipelines running from the wells to the setting tank facilities and from those facilities and the compressor stations to the refineries are a "fixed works" within the examples of "fixed works" listed in the rule, i.e., "gas transmission and distribution systems, pipelines and other systems for the transmission of petroleum. . . ." (Rule 1521, subd. (a)(1)(A)(2).) The pipe bolted to the wells and refineries and welded to its extensions is "material" and incorporated into real property by Fedrick in the performance of a "construction contract."

■ Fedrick made no showing of the cost of the pipe at trial. Hence, even if some other components of the "construction contract" are machinery and equipment, the inability to identify the costs of the two classes of items would compel a judgment in favor of the Board. "In a suit for refund of tax, the burden of proof is on the taxpayer. The taxpayer must not only prove that the tax assessment is incorrect, but also he must produce evidence to establish the proper amount of the tax. In an action for refund, 'the taxpayer has the burden of proof to show that he is entitled to his claim. He cannot assert error and thus shift to the state the burden to justify the tax. . . .' " (*Honeywell, Inc.* v. *State Bd. of Equalization* (1982) 128 Cal.App.3d 739, 744 [180 Cal.Rptr. 479]; citations omitted.) Since the pipe and the other items were placed "in one basket" by the failure to segregate costs, the conclusion that the pipe was taxable is fatal to Fedrick's claim for refund. (See *Robinson* v. *Franchise Tax Board* (1981) 120 Cal.App.3d 72, 82-83 [174 Cal.Rptr. 437].)

■ Nonetheless, we note that the entire setting tank facilities are part of a "fixed works" since that term includes "gas transmission and distribution systems, pipelines and other systems for the transmission of petroleum and other liquid or gaseous substances, refineries and chemical plants . . . ." Such a works is not "machinery and equipment," since "machinery and equipment" is property "not essential to the fixed works, building, or

structure itself . . . ." (Rule 1521, subd. (a)(6).) For this reason and because the setting tank facilities unequivocally satisfy the criteria of "fixtures" under the case law pertaining to that term, we conclude that all of the items in issue in this case are subject to sales tax under Revenue and Taxation Code section 6384.

Both under the case law pertaining to "fixtures" and under rule 1521 read in a manner consistent with that case law, the property here in issue is "materials" or "fixtures" and subject to tax. The trial court's reliance upon *Allstate Ins. Co.* v. *County of Los Angeles* (1984) 161 Cal.App.3d 877 [207 Cal.Rptr. 888] for the contrary result is unwarranted. That case held that "standardized off-the-shelf, general purpose computers and computer components, placed in general purpose office buildings, and connected to a power source by means of standardized plugs, and to each other by means of standardized cables, are and remain personalty regardless of whether or not use of a computer is essential to efficient and competitive operation of the business in which they are employed." (*Id.,* at pp. 891-892.) The custom fabrication of pipes and vessels, welded, and bolted into an integrated petroleum processing unit addressed to the unique characteristics of the realty in issue and attached to that realty by means of anchoring to concrete foundations or bolting to fixtures such as oil wells and refineries is in no way comparable.

The judgment is reversed.

Puglia, P. J., and Sims, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 9, 1988.

APPENDIX