[No. B027964. Second Dist., Div. One. Sept. 28, 1990.]

ASSOCIATED BEVERAGE COMPANY, INC., Plaintiff and Appellant, v.
BOARD OF EQUALIZATION, Defendant and Respondent.

WESTINGHOUSE BEVERAGE GROUP, INC., Plaintiff and Respondent, v.
BOARD OF EQUALIZATION, Defendant and Appellant.

COUNSEL

Poindexter & Doutre and William M. Poindexter for Plaintiff and Appellant in case No. C422313 and for Plaintiff and Respondent in case No. C498944.

John K. Van de Kamp, Attorney General, Edmond B. Mamer, Richard E. Nielsen and Carol H. Rehm, Jr., Deputy Attorneys General, for Defendant and Respondent in case No. C422313 and for Defendant and Appellant in case No. C498944.

OPINION

**SPENCER, P. J.—**

INTRODUCTION

Defendant State Board of Equalization appeals from that portion of the judgment ordering a refund of sales taxes to plaintiff Westinghouse Beverage Group, Inc. (formerly Associated Beverage Company, Inc.), in case No. C498944. Plaintiff Associated Beverage Company, Inc., appeals from that portion of the judgment ordering that plaintiff take nothing in case No. C422313.[1]

STATEMENT OF FACTS

*Case No. C498944*

Seven-Up manufactures and sells soft drinks in Southern California to various customers, including grocery stores, restaurants and gasoline sta-

---

[1] Since Westinghouse Beverage Group, Inc., and its predecessor Associated Beverage Company, Inc., do and did business as Seven-Up Bottling Companies of Southern California, they will be referred to hereinafter as Seven-Up.

tions. Defendant audited Seven-Up for the period of December 29, 1973, through September 21, 1978, and determined there was a sales tax deficiency. After Seven-Up paid the sum demanded, it filed a claim for the refund of $424,258 on March 21, 1980. Thereafter, on August 30, 1983, Seven-Up filed a revised claim for refund.

This claim challenged the portion of the deficiency involving Seven-Up's sales to vending machine owners and lessees who had a fixed place of business. Defendant had projected this deficiency assessment from samples which revealed Seven-Up did not have resale certificates from all of its vending machine customers. Defendant assessed tax on the retail price of the product sold through the vending machines, less tax included therein. Seven-Up did not notify defendant of the names and addresses of those vending machine owners and lessees who had not furnished it with resale certificates.

In July 1968, defendant surveyed soft drink bottlers in Los Angeles County concerning the application of the regulation pertinent to vending machine sales. Revenue and Taxation Code section 6359.4 had become effective on August 1, 1967. The purpose of the survey was to "ascertain the extent and nature of administrative problems" created by this change in the law and the concomitant amendments to the pertinent regulation. Among other facts, the survey sought to ascertain the number of customers governed by Revenue and Taxation Code section 6015. Seven-Up was among those surveyed.

Seven-Up was aware of the regulation and of the proposed changes therein accompanying the enactment of Revenue and Taxation Code section 6359.4. At the time, Seven-Up Bottling reported it had approximately 500 "section 6015" customers and 2,500 vending machine customers who held resale certificates; it reported "section 6015" customer sales as taxable at the retail price. According to Robert Peterson (Peterson), an auditor for defendant with more than 30 years' experience, the regulation has been applied to all suppliers of products normally sold through vending machines, specifically including beverage bottling companies, since at least 1950.

The price of Seven-Up's products did not rise above the exemption level of Revenue and Taxation Code section 6359.4 until late 1973 or 1974. According to Seven-Up's director of asset accounting and financial planning, Richard Ferguson (Ferguson), during the audit period of December 1973 through December 1978, Seven-Up had reported taxable sales at the wholesale price when the customer failed to supply a resale certificate rather than at the retail price as the regulation required.

Based on Peterson's long experience, many establishments with vending machines are not generally in the retail business and thus have no seller's permits. The absence of the regulation would create considerable administrative problems. Those establishments not otherwise engaged in sale activity or engaged only in exempt activity would be required to obtain a seller's permit to operate a single vending machine, and those selling products to vending machine operators would be required to obtain a resale certificate from every vending machine customer no matter how small. This would be a substantial administrative burden.

In the absence of this increasingly burdensome administrative system, significant tax revenues would be lost. Over the years, the receipts from vending machine operations traditionally have not been reported by the vending machine customer but by the original "6015 retailer," unless the vending machine customer has a resale certificate. Eliminating this procedure generally would result in the collection of tax only on the supplier's gross receipts rather than the retail sales price of the vending machine product.

For example, when a sale appears to have been made for resale but it is not certain at audit where or whether an item has been reported as subject to sales tax, in that the customer has not provided a resale certificate, a company such as Seven-Up may be required to send an "XYZ letter" to the customer involved so defendant can determine whether an item has been reported as subject to sales tax, is not so taxable or should have been but was not reported. More than 52 percent of those vending machine operators responding to Seven-Up's queries in a sampling covering July 1975 and February and October 1976 indicated they had not reported taxable sales. In contrast, only slightly more than 21 percent of nonvending machine customers had failed to report taxable sales.

If a purchaser lacked a resale certificate and sold a particular product partly over the counter and partly through a vending machine, both situations would present similar audit problems. In that case, it would be no more difficult to audit the sales made through vending machines than those made over the counter.

The vending machines supplied by Seven-Up carry the Seven-Up logo. They are of three types: those Seven-Up owns and from which it collects the receipts; those Seven-Up leases and from which the lessee collects the re-

ceipts; and those Seven-Up has sold and from which the owner collects the receipts.

*Case No. C422313*

During the audit period of October 1, 1977, through December 31, 1980, Seven-Up purchased bottles, cans, and other containers from various manufacturers. Thereafter, Seven-Up filled these containers with soft drinks it then sold primarily to retailers and occasionally to distributors. The beverage containers either were nonreturnable bottles and cans or reusable bottles. Defendant assessed sales and use taxes on Seven-Up's original purchase of reusable bottles, and Seven-Up paid sales tax reimbursement to California manufacturers from whom it purchased these bottles. Seven-Up seeks a refund of the sales and use taxes it paid.

All newly purchased beverage containers are rinsed before they are filled with soft drinks and sold. When reusable bottles are returned to Seven-Up, they are inspected for damage and washed thoroughly before they are refilled with soft drinks and resold. The reusable bottles are heavier to withstand more usage.

The only written agreement between the parties is the invoice for each transaction. The invoice specifies the product delivered, the price, the deposit charged for returnable containers of varying sizes and the deposit credit given in the event the returnable containers are returned to Seven-Up. The credit given is the same as the deposit charged.

In 1978, Seven-Up received 4,106,277 cases of bottles returned for reuse, while only 482,565 cases of such bottles were purchased new. During the same period, Seven-Up sold 3,643,791 cases of soft drinks. The returnable bottles are returned to plaintiff more than 50 percent of the time. On the average, the returnable bottles are reused four times; at that point, they generally have become chipped and must be discarded. Both returnable and nonreturnable containers bear Seven-Up's franchised trademarks. Returnable bottles are imprinted with such words as "Return for Deposit." From 1973 through 1979, Seven-Up treated the cost of new returnable bottles as a prepaid expense; the cost was reflected as an asset and depreciated over a four-year period.

CONTENTIONS

*Case No. C498944*

I

Defendant contends section 1574, subdivision (a)(4) (formerly subd. (a)(6)) of the California Code of Regulations, title 18, properly was applied to Seven-Up, in that it is within the scope of Revenue and Taxation Code section 6015.

*Case No. C422313*

II

Seven-Up asserts the trial court erred in determining its purchase of reusable bottles was subject to the use tax, in that Seven-Up resold the bottles to its customers and neither the initial filling of new bottles nor the refilling of returned, reusable bottles constituted an intervening nonsale use.

DISCUSSION

*Case No. C498944*

I

■ Defendant contends section 1574, subdivision (a)(4) (formerly subdivision (a)(6)) of the California Code of Regulations, title 18, properly was applied to Seven-Up, in that it is within the scope of Revenue and Taxation Code section 6015. We agree.

■ It is well settled that in an action for the recovery of sales or use taxes paid under protest, the taxpayer plaintiff bears the burden of proving an excessive assessment or collection has been made. (*Macrodyne Industries, Inc.* v. *State Bd. of Equalization* (1987) 192 Cal.App.3d 579, 581-582 [237 Cal.Rptr. 537]; *Long Beach Firemen's Credit Union* v. *Franchise Tax Bd.* (1982) 128 Cal.App.3d 50, 55 [179 Cal.Rptr. 869].) ■ Where, as here, the basic facts are not in dispute, the question raised is purely one of law to be decided independently by the reviewing court. (*C. R. Fedrick, Inc.* v. *State Bd. of Equalization* (1988) 204 Cal.App.3d 252, 258 [251 Cal.Rptr. 305].)

 The privilege of selling at retail in this state imposes on the seller a tax on gross receipts from all sales of tangible personal property in the state. (Rev. & Tax. Code, § 6051.) A " 'retail sale' " is one made "for any purpose other than resale in the regular course of business in the form of tangible personal property." (Rev. & Tax. Code, § 6007.)

Revenue and Taxation Code section 6015 defines a retailer generally as "[e]very seller who makes any retail sale or sales of tangible personal property" (subd. (a)) and "[e]very person engaged in the business of making sales for storage, use, or other consumption" (subd. (b)). It further provides: "When the board determines that it is necessary for the *efficient administration* of this part [the Sales and Use Tax Act] to regard any salesmen, representatives, peddlers or canvassers as the agents of the dealers, distributors, supervisors, or employers under whom they operate or from whom they obtain the tangible personal property sold by them, irrespective of whether they are making sales on their own behalf or on behalf of such dealers, distributors, supervisors, or employers the board may so regard them and may regard the dealers, distributors, supervisors, or employers as *retailers* for purposes of this part." (Italics added.) Section 6015 became effective on July 1, 1943, after it was added by Statutes 1941, chapter 36, section 1 and amended by Statutes 1943, chapter 699, section 3. (See Gov. Code, § 9605.)

In 1945, defendant adopted what is now section 1574 of the California Code of Regulations, title 18, as a restatement of previous rulings. In its initial form, section 1574 was known as rule 45. Section 1574 applies specifically to vending machine operators. What is now subdivision (a)(4) and formerly was subdivision (a)(6) addresses sales made to vending machine operators who do not furnish resale certificates to the seller.

Subdivision (a)(4) of section 1574 of title 18 of the California Code of Regulations provides: "Persons making sales of tangible personal property of a kind the gross receipts from the retail sale of which are taxable, to operators of vending machines to be resold through such machines, must notify this board of the name and address of each operator who fails to furnish a valid resale certificate. In the event such persons fail to so notify the board . . . then, pursuant to [Revenue and Taxation Code s]ection 6015, they are required to return the tax to the state, measured by the receipts from the retail sale of the property."

Thus, this subdivision of California Code of Regulations, title 18, section 1574 represents a very early interpretation of Revenue and Taxation Code

section 6015. Generally, it classifies unreported vending machine operators who have not furnished resale certificates to the seller as agents of the seller who then is regarded as the retailer. A vending machine operator is "any person who owns or possesses vending machines and who controls the operations of the machines, as by placing the merchandise therein or the removing coins therefrom, and who has access thereto for any purpose connected with the sale of merchandise through the machines, and whose compensation is based, in whole or in part, upon receipts from sales made through such machines." (Rev. & Tax. Code, § 6021.)

The Legislature has delegated to defendant the duty of enforcement and the authority to prescribe rules and regulations pertaining to the Sales and Use Tax Law. (Rev. & Tax. Code, §§ 7051, 7052.) ■ Where an administrative agency has adopted a regulation pursuant to the rulemaking authority delegated to it by the Legislature, the regulation has the force and effect of a statute. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 401 [128 Cal.Rptr. 183, 546 P.2d 687].) ■ So long as the administrative agency exercises the discretion delegated to it within the scope of the controlling statute, the courts will not disturb the administrative judgment. (*Ontario Community Foundations, Inc.* v. *State Bd. of Equalization* (1984) 35 Cal.3d 811, 816 [201 Cal.Rptr. 165, 678 P.2d 378].) The agency's construction of the statute will be given great weight; if it appears to have a reasonable basis, the courts will not substitute their judgment for that of the agency. (*Ibid.*)

However, this is the case only when the regulation is " ' "consistent, not in conflict with the statute, and reasonably necessary to effectuate its purpose." [Citations.]' " (*Ontario Community Foundations, Inc.* v. *State Bd. of Equalization, supra*, 35 Cal.3d at p. 816.) Accordingly, " '[t]he task of the reviewing court in such a case " 'is to decide whether the [agency] reasonably interpreted the legislative mandate.' [Citation.]" [Citation.] Such a limited scope of review constitutes no judicial interference with the administrative discretion in that aspect of the rulemaking function which requires a high degree of technical skill and expertise. [Citation.] Correspondingly, there is no agency discretion to promulgate a regulation which is inconsistent with the governing statute . . . . "Our function is to inquire into the legality of the regulation[], not [its] wisdom . . . ." "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to[,] strike down such regulations." [Citation.]' [Citation.]" (*Id.* at pp. 816-817, italics omitted.)

■ Seven-Up perceives several bases upon which the regulation at issue here fails this test. First, Seven-Up argues, Revenue and Taxation

Code section 6015 requires defendant to make an express finding of administrative necessity, and there is nothing in the record to indicate such a finding was made. That defendant is unable to produce any evidence of the conclusions it reached in promulgating this regulation is not surprising and adds no support to Seven-Up's position; the regulation first was formulated 45 years ago. Since it is presumed official duty is regularly performed (Evid. Code, § 664), it may be assumed defendant gave due consideration to the facts and circumstances before promulgating the instant regulation. More importantly, however, Seven-Up's basic premise is flawed.

Revenue and Taxation Code section 6015 does not prescribe any particular procedure defendant is to follow in applying its "agency" provisions. It simply empowers defendant to act in a certain manner when defendant "determines that it is necessary for the efficient administration" of the Sales and Use Tax Act that defendant do so. There is nothing to suggest defendant is required to make any kind of express oral or written finding, rather than simply deliberating the matter and acting on its conclusion. Indeed, there is no indication defendant has *ever* made an express finding.

Under defendant's usual procedure, in considering the question on a case by case basis, it meets to determine whether a taxpayer comes within the provisions of Revenue and Taxation Code section 6015; if so, defendant classifies the taxpayer as a "Section 6015 retailer," then so notifies the taxpayer. Letters of notification do not appear to contain any express finding. (See *Sunshine Art Studios of California, Inc.* v. *State Bd. of Equalization* (1974) 39 Cal.App.3d 223 [114 Cal.Rptr. 24] [letter sent to plaintiff simply gave notice of defendant's order that plaintiff be regarded as the retailer; it included no express finding of necessity].)

The essential determination is that the reclassification of certain taxpayers is necessary to the efficient administration of the sales tax. Section 1574, subdivision (a)(4) of the California Code of Regulations, title 18, impliedly makes exactly that determination. In essence, subdivision (a)(4) embodies a conclusion it is necessary for the efficient administration of the sales tax to treat *all* suppliers of a certain class of vending machine operators as retailers.

Seven-Up also argues the regulation is invalid, in that defendant failed to follow its normal procedure in applying the reclassification provision of Revenue and Taxation Code section 6015. Generally, defendant does not apply Revenue and Taxation Code section 6015 on an industry- or class-wide basis, but looks at an individual business and determines whether it is appropriate to regard the initial purveyor as the retailer, thereafter follow-

ing the procedure delineated above. However, there is nothing in Revenue and Taxation Code section 6015 that requires defendant to proceed in this manner.

Obviously, in some cases, industry- or class-wide treatment will be justified. When a problem is endemic, the efficient solution is the promulgation of a regulation to deal with it. (See *Henry's Restaurants of Pomona, Inc.* v. *State Bd. of Equalization* (1973) 30 Cal.App.3d 1009 [106 Cal.Rptr. 867] [drive-in restaurants may be treated as if no food will be consumed on the premises due to the difficulty of determining what food is in fact consumed on the premises].) Indeed, since the promulgation of California Code of Regulations, title 18, section 1574, subdivision (a)(4) and its predecessors represents one of defendant's earliest applications of Revenue and Taxation Code section 6015, it can be characterized as a procedure equally well established as is the case-by-case procedure to which Seven-Up refers. Inasmuch as Revenue and Taxation Code section 6015 contains no proscription against defendant making an industry- or class-wide determination that administrative efficiency necessitates treating certain taxpayers as retailers, there is no validity to Seven-Up's complaint that such a determination was not made as to it individually.

Additionally, Seven-Up argues it had no notice it was classified as a "Section 6015 retailer" and, thus, the regulation cannot be applied to its operations. It is inconceivable that a regulation of such wide application and long standing would be unknown to taxpayers such as Seven-Up who regularly purvey their products to vending machine operators. Indeed, the evidence is to the contrary.

In July 1968, defendant surveyed soft drink bottlers in Los Angeles County concerning the application of the regulation. Revenue and Taxation Code section 6359.4, exempting from sales tax those operators who sold items through vending machines at no more than a certain price, had been enacted by Statutes 1967, chapter 963, section 7, and had become effective on August 1, 1967. The purpose of the survey was to "ascertain the extent and nature of administrative problems" created by this change in the law and the concomitant amendments to the regulation, then rule 45. Among other facts, the survey sought to ascertain the number of customers governed by Revenue and Taxation Code section 6015. Seven-Up was among those surveyed.

Seven-Up was aware of the regulation and of the proposed changes therein accompanying the enactment of Revenue and Taxation Code section

6359.4. At the time, Seven-Up reported it had approximately 500 "section 6015" customers and 2,500 vending machine customers who held resale certificates; it reported "section 6015" customer sales as taxable at the retail price. In other words, as of July 1968, Seven-Up was well aware of the applicability of the regulation to its operations and, for some time, had been reporting taxable sales in a manner consistent with California Code of Regulations section 1574, title 18, subdivision (a)(4). Ferguson confirmed this. In addition, according to Peterson, the regulation has been applied to all suppliers of products normally sold through vending machines, specifically including beverage bottling companies, since at least 1950.

The price of Seven-Up's products did not rise above the exemption level of Revenue and Taxation Code section 6359.4 until late 1973 or 1974. At that point, Seven-Up's officers apparently had forgotten about the applicability of the regulation. According to Ferguson, during the audit period of December 1973 through December 1978, Seven-Up had reported taxable sales at the wholesale price when the customer failed to supply a resale certificate rather than at the retail price as the regulation required. Nonetheless, it is clear Seven-Up has failed to establish any reasonable basis upon which it may claim lack of notice.

Seven-Up next argues there is no solid evidence that administrative efficiency necessitated the regulation. To the contrary, there is clear evidence supporting defendant's implied determination to that effect. Based on Peterson's long experience, many establishments with vending machines are not generally in the retail business and thus have no seller's permits. The absence of the regulation would create considerable administrative problems. Those establishments not otherwise engaged in sale activity or engaged only in exempt activity would be required to obtain a seller's permit to operate a single vending machine, and those selling products to vending machine operators would be required to obtain a resale certificate from every vending machine customer no matter how small. This would be a substantial administrative burden.

In the absence of this increasingly burdensome administrative system, significant tax revenues would be lost. Over the years, the receipts from vending machine operations traditionally have not been reported by the vending machine customer but by the original "6015 retailer," unless the vending machine customer has a resale certificate. Eliminating this procedure generally would result in the collection of tax only on the supplier's gross receipts rather than the retail sales price of the vending machine product.

For example, when a sale appears to have been made for resale but it is not certain at audit where or whether an item has been reported as subject to sales tax, in that the customer has not provided a resale certificate, a company such as Seven-Up may be required to send an "XYZ letter" to the customer involved so defendant can determine whether an item has been reported as subject to sales tax, is not so taxable or should have been but was not reported. More than 52 percent of those vending machine operators responding to Seven-Up's queries in a sampling covering July 1975 and February and October 1976 indicated they had not reported taxable sales. In contrast, only slightly more than 21 percent of non-vending machine customers had failed to report taxable sales. In other words, an extraordinarily high percentage of those vending machine customers who had not provided resale certificates failed to report their taxable sales.

Moreover, while the "XYZ letter" device can detect these situations in a field audit, it will not necessarily do so. Since vending machines often can be found at establishments that have no other taxable activity and can in themselves be small operations, the supplier's records will not necessarily reflect that the sales to these establishments appear to have been made for resale. If that is the case, no inquiry will be made and, since the establishment in question will not itself be audited for sales activity, the taxable vending machine sales well may go undetected. Thus, the large supplier of vending machine products provides a far easier control point from which to collect sales tax than would the many people and establishments who have a major source of revenue other than taxable retail activity and vend products through machines only as a sideline.

To be sure, there is evidence that, hypothetically, *if* a purchaser lacked a resale certificate and sold a particular product partly over the counter and partly through a vending machine, both situations would present similar audit problems. In that situation, it would be no more difficult to audit the sales made through vending machines than those made over the counter. However, there is no evidence this hypothetical situation has occurred with Seven-Up's products or, in fact, ever occurs.

One of the purposes of Revenue and Taxation Code section 6015 is to prevent the escape of substantial tax revenue. (*Sunshine Art Studios of California, Inc.* v. *State Bd. of Equalization, supra*, 39 Cal.App.3d at p. 227.) Viewing the evidence in its totality, it appears clear defendant has succeeded in demonstrating section 1574, subdivision (a)(4) of the California Code of Regulations, title 18, is reasonably necessary to the efficient administration of the sales tax law as it applies to vending machine operators.

In sum, the uncontradicted evidence demonstrates California Code of Regulations, title 18, section 1574, subdivision (a)(4) is consistent and not in conflict with Revenue and Taxation Code section 6015, and is " ' "reasonably necessary to effectuate its purpose." ' " (*Ontario Community Foundations, Inc.* v. *State Bd. of Equalization, supra,* 35 Cal.3d at p. 816.) Consequently, the administrative classification will not be disturbed unless it is arbitrary, capricious or patently unreasonable. (*Wallace Berrie & Co.* v. *State Bd. of Equalization* (1985) 40 Cal.3d 60, 65 [219 Cal.Rptr. 142, 707 P.2d 204].)

As noted *ante,* many vending machine operators would escape the sales tax net were it not for the mechanism provided by the regulation. Clearly, it is not unduly burdensome in its operation. A taxpayer such as Seven-Up need not submit to reclassification as a retailer with respect to those of its vending machine customers who do not submit resale certificates. It may escape treatment as a retailer altogether by the simple medium of supplying to defendant the names and addresses of those customers, allowing defendant to pursue the collection of tax directly from them. In fact, since the audit underlying the instant action, Seven-Up has, without difficulty, put into place a compliance mechanism. Thus, it cannot be said the regulation is arbitrary, capricious or patently unreasonable.

Seven-Up next argues the regulation cannot be applied legitimately to its own vending machine customers, relying on the following: The evidence indicates that most of Seven-Up's sales were to vending machine operators having a fixed place of business. Revenue and Taxation Code section 6015 permits defendant to regard as agents only "salesmen, representatives, peddlers or canvassers." Black's Law Dictionary (5th ed. 1979) page 1202, defines a salesman as a "Commercial traveler; Dealer; Drummer; Hawker; Peddler." Therefore, since persons operating vending machines at fixed locations do not come within the meaning of any of the listed synonyms, Revenue and Taxation Code section 6015 cannot validly be applied to them.

■ In ascertaining legislative intent "so as to effectuate the purpose of the [statute]" (*City of Los Angeles* v. *Carson* (1960) 181 Cal.App.2d 540, 544 [5 Cal.Rptr. 356]), the courts look first to the words of the statute (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]); there is a heavy burden on the party asking the courts not to follow the clear language of a statute (*West Covina Hospital* v. *Superior Court* (1986) 41 Cal.3d 846, 851 [226 Cal.Rptr. 132, 718 P.2d 119, 60 A.L.R.4th 1257]). The statutory language used is to be given its usual,

ordinary meaning; wherever possible, significance must be given to every word and phrase. (*Moyer*, *supra*, at p. 230.)

■ The usual, ordinary meaning of the word "salesman" encompasses one who sells in a given territory *and* one who sells goods at a fixed location. (Webster's New Internat. Dict. (3d ed. 1981) p. 2003, col. 2.) "Salesman" also is synonymous with "vendor." (*Id* at p. 2540, col. 1.) Moreover, to define "salesman" as synonymous with "peddler," as does Black's Law Dictionary, would be to strip the separate statutory reference to "peddlers" of any independent significance in direct contravention of settled rules of statutory construction. (See *Moyer* v. *Workmen's Comp. Appeals Bd.*, *supra*, 10 Cal.3d at p. 230.) The machines from which Seven-Up's products are vended bear the Seven-Up logo. Hence, logically, notwithstanding the fixed location from which most operators work, they come within the plain, ordinary meaning of "salesmen," i.e., those who offer Seven-Up's products for sale to others.

Finally, Seven-Up asserts the regulation cannot be applied legitimately to its operations, employing the following reasoning: Revenue and Taxation Code section 6015 permits defendant to regard salesmen and the like as the agents only of "dealers, distributors, supervisors, or employers." Seven-Up does not exercise any control over the operators of the vending machines it sells or leases and, hence, cannot be characterized as a supervisor or employer. *Sunshine Art Studios of California, Inc.* v. *State Bd. of Equalization*, *supra*, 39 Cal.App.3d at page 228 defines a "distributor" as " '[a]n agent or agency for marketing, usually in a particular territory, some manufactured goods or other commodities.' " Thus, Seven-Up cannot be considered a distributor. In addition, since Black's Law Dictionary, *supra*, at page 1202, defines "salesman" as synonymous with "dealer," Seven-Up cannot be considered a dealer.

Once again, Seven-Up fails to consider the usual, ordinary range of meaning given these words. "Distributor" also commonly is defined as "one that markets a commodity" (Webster's New Internat. Dict., *supra*, at p. 660, col. 3), and "dealer" also commonly is defined as "one that does business" (*id.* at p. 581, col. 1). To be sure, "dealer" has been defined judicially as "one who buys at one price from a manufacturer for resale at a higher price," or synonymous with the term "middleman." (*L. A. Coin-O-Matic Laundries* v. *Harow* (1961) 195 Cal.App.2d 324, 335 [15 Cal.Rptr. 693].) However, that definition was generated by the specific circumstances at issue in the case. From the evidence in this matter, it is clear Seven-Up rarely deals with "middle men," whom it terms distributors; generally, it relies on an internal

sales force. That is, Seven-Up usually acts as a dealer or distributor itself and most of those to whom it sells in the first instance act, in turn, as "salesmen" in retailing the products to the ultimate consumer. The common dictionary meanings of the words "dealer" and "distributor" recognize this manner of doing business. That Seven-Up chooses to conduct its business in this manner should not exempt it from the operation of California Code of Regulations, title 18, section 1574, subdivision (a)(4).

In any event, prior to 1968, Seven-Up consistently behaved as if it and its vending machine customers came within the terms of Revenue and Taxation Code section 6015. For decades, the regulation at issue was applied uniformly without challenge from plaintiff or any other similar taxpayer. These are factors entitled to great weight. (*Mission Pak Co.* v. *State Bd. of Equalization* (1972) 23 Cal.App.3d 120, 126 [100 Cal.Rptr. 69].) In sum, section 1574, subdivision (a)(4) of the California Code of Regulations, title 18, can be and has been applied to Seven-Up legitimately. Accordingly, that portion of the judgment ordering a refund of sales taxes to Seven-Up in case Number C498944 must be reversed.

*Case No. C422313*

## II

■ Seven-Up asserts the trial court erred in determining its purchase of reusable bottles was subject to the use tax, in that it resold the bottles to its customers and neither the initial filling of new bottles nor the refilling of returned, reusable bottles constituted an intervening nonsale use. We disagree.

Once again, the basic facts are not in dispute. Hence, the question raised is purely one of law to be decided independently by this court. (*C. R. Fedrick, Inc.* v. *State Bd. of Equalization, supra,* 204 Cal.App.3d at p. 258.) Revenue and Taxation Code section 6006, subdivision (a), defines a sale as including "[a]ny transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner by any means whatsoever, of tangible personal property for a consideration." This parallels the common law and Uniform Commercial Code definitions of "sale." (*King* v. *State Bd. of Equalization* (1972) 22 Cal.App.3d 1006, 1012 [99 Cal.Rptr. 802].) Section 2401, subdivision (2) of the Uniform Commercial Code provides in pertinent part: "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . ." In contrast, a bailment, or

"deposit for keeping," does not involve the transfer of title. (See Civ. Code, § 1817.) Unless the receiving party is obligated to return or account for the property, there is a sale rather than a bailment. (*H. S. Crocker Co., Inc.* v. *McFaddin* (1957) 148 Cal.App.2d 639, 644 [307 P.2d 429].)

Here, Seven-Up had no right to demand the return of the reusable bottles containing its product which it conveys to retailers. The only written agreement between the parties is the invoice for each transaction. The invoice specifies the product delivered, the price, the deposit charged for returnable containers of varying sizes and the deposit credit given in the event the returnable containers are returned to Seven-Up. The credit given is the same as the deposit charged, and the deposit fee specifically is nontaxable pursuant to California Code of Regulations, title 18, section 1589, subdivision (b)(1). On these facts, Seven-Up argues, it is clear it sold the returnable bottles *and* their contents to the retailers, after which it repurchased many of these same bottles from the retailers.

There are additional pertinent facts, however. In 1978, Seven-Up received 4,106,277 cases of bottles returned for reuse, while only 482,565 cases of such bottles were purchased new. During the same period, Seven-Up sold 3,643,791 cases of soft drinks. The reusable bottles are returned to Seven-Up more than 50 percent of the time. On the average, these bottles are reused four times; at that point, they generally have become chipped and must be discarded. Both returnable and nonreturnable containers bear Seven-Up's franchised trademarks. Returnable bottles are imprinted with such words as "Return for Deposit." From 1973 through 1979, Seven-Up treated the cost of new returnable bottles as a prepaid expense; the cost was reflected as an asset and depreciated over a four-year period.[2] In 1978, a retailer paid 13 cents for the contents of a 16-ounce returnable bottle and 15 cents for the contents of a 16-ounce nonreturnable bottle, if the cost of the contents is calculated as the total price charged the retailer (including the

---

[2] Seven-Up argues it is improper to rely on this evidence, in that its treatment of the new bottles as depreciable assets applied to its income tax accounting procedures only. In support of this argument, Seven-Up relies on *King* v. *State Bd. of Equalization, supra*, 22 Cal.App.3d at pages 1010-1011. *King* says nothing of the sort. The court considered statutory definitions of such items as fixtures as set forth in the property tax law and rejected their use to determine the character of property for purposes of the sales and use tax law. (*Id.* at p. 1011; accord *United States Lines, Inc.* v. *State Bd. of Equalization* (1986) 182 Cal.App.3d 529, 535-536 [227 Cal.Rptr. 347].) In contrast, it has been recognized specifically that the treatment of an item as a fixed asset for income tax purposes manifests an intent not to hold it for purposes of resale, in that property held for such sale in the ordinary course of business is not depreciable as a capital asset. (*McConville* v. *State Bd. of Equalization* (1978) 85 Cal.App.3d 156, 161 [149 Cal.Rptr. 194].) Thus, it is a proper factor for a court to consider in determining the purpose for which a taxpayer held property. (*Id.* at p. 162.)

deposit fee in the case of returnable bottles) less the cost of the bottle (amortized in the case of returnable bottles) to Seven-Up.

Assuming arguendo Seven-Up correctly characterizes the transaction as a sale of returnable bottles to the retailers, that does not resolve the ultimate question. California imposes a sales tax on all retailers "[f]or the privilege of selling tangible personal property at retail." (Rev. & Tax. Code, § 6051.) A retail sale is "a sale for *any purpose other than* resale in the regular course of business." (Rev. & Tax. Code, § 6007, italics added.) A sale is presumed to be for retail; the burden of proving otherwise "is upon the person who makes the sale unless he takes from the purchaser a certificate to the effect that the property is purchased for resale." (Rev. & Tax. Code, § 6091.) Thus, the critical question is not whether Seven-Up ultimately "sold" the returnable bottles to its retailers, but whether it purchased these bottles for the *purpose* of so reselling them.

Seven-Up points to numerous cases from other jurisdictions in support of its position. Many of these cases have no pertinence, in that they deal with statutory language specifically exempting from taxation *any* container or "furnished container" of the product, language not found in California's statutes. (See, e.g., *Weed v. Occhiato* (1971) 175 Colo. 509 [488 P.2d 877, 878-879]; *Undercofler v. Buck* (1963) 107 Ga.App. 870 [132 S.E.2d 157, 159-160]; *Horn v. Goldenrod Enterprises* (Ala. 1958) 267 Ala. 329 [101 So.2d 310, 311]; *Evans v. Memphis Dairy Exchange* (1952) 194 Tenn. 317 [250 S.W.2d 547-548]; *Zoller Brewing Co. v. State Tax Commission* (1942) 232 Iowa 1104 [5 N.W.2d 643, 644].) Other cases do not mention or consider the application of any sort of container exemption, but simply conclude the bottler purchased the containers for resale—notwithstanding their returnability—because the container became an "integral part" of the product. (See, e.g., *Smith Beverage Co. of Columbia v. Reiss* (Mo. 1978) 568 S.W.2d 61, 62, 64, 66 [97 A.L.R. 3d 1187]; *Nehi Bottling Co. v. Gallman* (1972) 39 A.D.2d 256 [333 N.Y.S.2d 824, 825-826], affd. (1974) 34 N.Y.2d 808 [359 N.Y.S.2d 44]; *Belleville Dr. Pepper v. Korshak* (1966) 36 Ill.2d 352 [221 N.E.2d 635, 637]; *Goebel Brewing Co. v. Brown* (1943) 306 Mich. 222 [10 N.W.2d 835, 837].)

California's law contains exemptions from taxation for "the gross receipts from sales of and the storage, use, or other consumption in this State of" certain very specific types of containers. (Rev. & Tax. Code, § 6364.) Revenue and Taxation Code section 6364 limits the exemption to "[n]onreturnable containers when sold without the contents to persons who place the contents in the container and sell the contents together with the container" (subd. (a)), "[c]ontainers when sold with the contents if the sales

price of the contents is not required to be included in the measure of the taxes imposed by this part" (subd. (b)), and "[r]eturnable containers when sold with the contents *in connection with a retail sale of the contents or when resold for refilling*" (subd. (c), italics added). Revenue and Taxation Code section 6364 defines a returnable container as one "of a kind customarily returned by the buyer of the contents for reuse."

■■ Statutes granting exemption from taxation are to be strictly construed to avoid enlarging or extending the concession beyond the plain meaning of the language used in granting it. (*Santa Fe Transp.* v. *State Board of Equal.* (1959) 51 Cal.2d 531, 539 [334 P.2d 907]; *Parfums-Corday, Inc.* v. *State Bd. of Equalization* (1986) 187 Cal.App.3d 630, 637 [232 Cal.Rptr. 56].) Thus, the party claiming an exemption bears the burden of showing it clearly comes within the terms authorizing exemption (*ibid.*; *H. J. Heinz Co.* v. *State Board of Equalization* (1962) 209 Cal.App.2d 1, 4 [25 Cal.Rptr. 685]), and any doubt must be resolved against the right to an exemption (*Estate of Simpson* (1954) 43 Cal.2d 594, 602 [275 P.2d 467, 47 A.L.R.2d 991]; *J. C. Penney Ins. Co.* v. *State Bd. of Equalization* (1979) 94 Cal.App.3d 685, 693 [157 Cal.Rptr. 1]). Moreover, where the statute contains an express enumeration of exemptions, additional exemptions should not be presumed. (*People* v. *Mancha* (1974) 39 Cal.App.3d 703, 713 [114 Cal.Rptr. 392].) In addition, the specific statute takes precedence over the general and will be considered an exception thereto. (*Robertson* v. *Willis* (1978) 77 Cal.App.3d 358, 365 [143 Cal.Rptr. 523]; see also *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 420 [128 Cal.Rptr. 183, 546 P.2d 687].)

While this is a case of first impression in California, there are six cases from other jurisdictions which do consider a container exemption statute the same as or closely similar to Revenue and Taxation Code section 6364. Two of these cases hold the transaction *is* exempt from taxation.

In considering an Indiana container exemption statute closely similar in language to Revenue and Taxation Code section 6364, the court in *Indiana Dept. of State Rev.* v. *Assoc. Beverage Co.* (1976) 170 Ind. App. 467 [353 N.E.2d 544] concludes the failure to mention the sale of returnable containers for the initial filling does not compel a conclusion that sale is not exempt. (353 N.E.2d at p. 545.) The court rejects the argument the bottler purchased the bottles for its own use rather than for resale, concluding the bottler is not the ultimate user: " 'The bottles go down the line from manufacturer to [bottler] to . . . retailer to the customer who . . . finally drinks [the contents]. He is the ultimate or last user of the bottle as well as its

contents, and he and he alone determines whether the bottle may again enter the channels of trade . . . . The empty bottle may retrace its steps . . . , it is true, but on the other hand may find itself in an ash can or being put to other uses more or less practical and advantageous to its then owner.' [Citation.]" (*Id.* at pp. 546-547.) That the bottle *may* be returned simply makes the transaction one of sale or return. (*Id.* at p. 547.) However, at no point in its opinion does the court discuss or consider the purpose, intent or meaning of the returnable container exemption.

Likewise, the court in *Coca-Cola Bottling Wks. Co.* v. *Kentucky Dept. of Rev.* (Ky. 1974) 517 S.W.2d 746, considers a Kentucky statute containing language identical to that of Revenue and Taxation Code section 6364. Initially, the court characterizes the deposit charged on the returnable containers as "a redemption price which the company agreed to pay to the dealers (and in fact to any member of the public who returned bottles . . .) for empty bottles . . . returned to the company. There was no obligation on any dealer to return any empty bottles . . . ; the dealer was free to use them for any purpose of his own, or to throw them away." (*Id.* at p. 747.) On these facts, the court holds, "title . . . clearly passed to the dealers, and the 'redemption' by the company was in legal effect a *sale* back to the company." (*Ibid.*, italics in the original.)

Upon examining the exemption statute, the court characterizes the language concerning returnable containers as "obviously recogniz[ing] that such transactions [the transfer of returnable containers to the retailer while charging a deposit fee] are sales." (*Coca-Cola Bottling Wks. Co.* v. *Kentucky Dept. of Rev., supra,* 517 S.W.2d at p. 748.) The court rejects the argument the low deposit value indicates the absence of any bona fide intent to sell. "As a practical matter, the company could afford to sell the bottles . . . below cost, knowing that most buyers, having little use for the empty bottles . . . , would be willing to sell them back at the original sale price. At the same time, the buyer would rather purchase the bottles . . . knowing that he could resell them to the company, than to . . . put up a substantial deposit to guarantee return of bottles . . . to which the company insisted upon retaining title." (*Ibid.*) Throughout this discussion, the court fails to consider the status of the initial sale for filling in relation to the returnable container exemption. Neither does it address the intent and purpose of the exemption.

In contrast, those cases holding the initial sale of a returnable bottle for filling is *not* exempt from taxation devote considerable attention to the purpose, intent and meaning of the returnable container exemption.

In *Pepsi Cola Bottling Co.* v. *Peters* (1972) 189 Neb. 271 [202 N.W.2d 582], the court looks to a returnable container exemption containing language identical to that of California's Revenue and Taxation Code section 6364, subdivision (c). Basically, the case involves the same facts as does the instant matter. While the court recognizes there is a sale of the bottles to the retailer notwithstanding the payment of a deposit, in that the purchaser has no obligation to return or account for the bottles, the court views the language of the returnable container exemption as "a legislative recognition of the fact that bottlers do not purchase reusable containers for the purpose of resale, but for use as a means to convey their product to the consumer. [Citations.] Thus, the sale to the bottler of reusable containers by the manufacturers . . . is a sale at retail." (202 N.W. 2d at pp. 583-584.)

The court further notes: "To the extent that the unreimbursed cost of reusable containers is a part of the cost of doing business, it is included in the price of the product the same as the cost of machinery and equipment in the plant . . . . In reality, the reusable containers are a part of the equipment of the bottler because they are used over and over again until lost or destroyed. This is not a basis upon which to conclude that their sale to the bottler by manufacturers . . . is not subject to tax. Rather, it is a basis upon which to conclude that the sale of reusable containers to the bottler is a sale at retail and not a sale for resale." (*Pepsi Cola Bottling Co.* v. *Peters, supra,* 202 N.W.2d at p. 584.)

In *Pepsi Cola Bottling Co.*, as here, the plaintiff contended the sale to bottlers of reusable containers should not be taxable, in that the containers became an " 'ingredient or component part' " of the product, and thus were excluded from the category of a retail sale. In rejecting the contention, the court states it "would have more validity if applied to nonreusable containers since they are sold to the consumer with the product and never returned. The act recognizes this difference by excluding the sale of nonreturnable containers from a retail sale when sold without the contents to persons who place the contents in the container and sell the contents together with the container. [Citation.] The reusable containers are not an ingredient or component part of the product because they are dealt with separately, through the system of deposit and return, and are reused indefinitely until lost or destroyed." (202 N.W.2d at p. 584.) Moreover, the court concludes, separate treatment of returnable and nonreturnable containers is not arbitrary or unreasonable; there is a factual difference in circumstances justifying discrete classifications for each. (*Ibid.*)

*East Texas Oxygen Co.* v. *State* (Tex. 1984) 681 S.W.2d 741 essentially follows the same reasoning as that applied in *Pepsi Cola Bottling Co.*, inter-

preting statutes containing the same language. The court then concludes the returnable container exemption must be interpreted as meaning the initial purchase of the container from the manufacturer is not exempt; to interpret it otherwise is to render it meaningless, for the sales would be exempt as sales for resale *without any need* for an exemption. "This provision for imposition of the sales tax on the seller of the goods, while implied and not expressed, is nevertheless required by provisions *specifically* dealing with containers and must prevail over and constitute an *exception* to the general rule that 'sales for resale' are exempt from the sales tax. [Citation.] This construction is in accordance with the letter and the rationale of the rule that 'tax exemptions are subject to strict construction since they are the antithesis of equality and uniformity.' [Citation.]" (*Id.* at p. 745, italics in the original; see also *Coca Cola Bottling* v. *Com'r of Revenue* (1985) 393 Mass. 726 [473 N.E.2d 187, 188-190].)

In *Red Fox Gingerale Company* v. *Langton* (1966) 100 R.I. 531 [217 A.2d 466], the court also considers the same returnable container exemption language found in California's Revenue and Taxation Code section 6364, subdivision (c). It notes this provision evinces a clear legislative intent to exempt from taxation "the receipts obtained from any transaction which constitutes a medium through which such containers are put into normal channels of trade for the purpose of selling the contents of them at retail to the ultimate consumer. The exemption was clearly designed to relieve this industry from potentially destructive taxation on the returnable containers used in the industry on such occasions as they are utilized repeatedly to put the product of the taxpayer into the market place for retail sale. [¶] We cannot agree, however, that [the provision clearly manifests a] legislative intent to relieve this industry from all taxation . . . based on the acquisition of potentially returnable containers for the purpose of using them as an integral part of the processing procedures . . . that are preliminary to the preparation and packaging of the product for [resale]." (217 A.2d at p. 468.)

The court concludes the bottles do not come within the definition of returnable containers until they actually are placed in the channels of trade. Thus, the initial acquisition of the containers would be taxable. (*Red Fox Gingerale Company* v. *Langton, supra*, 217 A.2d at p. 468.)

We find the latter line of cases, particularly *East Texas Oxygen Co.* v. *State, supra*, 681 S.W.2d 741 and *Pepsi Cola Bottling Co.* v. *Peters, supra*, 202 N.W.2d 582, very well reasoned and highly persuasive. However, Seven-Up maintains California's doctrine of intervening use prevents any reliance on the foregoing rationale. As a general rule, if the use to which

property is put in the normal course of business relates to the sale of that property, the use is nontaxable. (*McConville* v. *State Bd. of Equalization, supra,* 85 Cal.App.3d at p. 160; *Hawley* v. *Johnson* (1943) 58 Cal.App.2d 232, 239 [136 P.2d 638].) However, if the initial purpose of purchasing containers is to fill them with product in preparation for reselling the product, this initial use is taxable unless specifically exempted. (See *H. J. Heinz Co.* v. *State Board of Equalization, supra,* 209 Cal.App.2d at p. 5.) In determining this issue, our courts consistently look "to the primary intent of the purchaser or the primary purpose of the purchase. [Citations.]" (*Kaiser Steel Corp.* v. *State Board of Equalization* (1979) 24 Cal.3d 188, 192-193 [154 Cal.Rptr. 919, 593 P.2d 864].) Thus, "[w]here there are simultaneous uses but only one or primary purpose for the purchase, the entire unit of material is taxed or not taxed, depending on that purpose." (*Id.* at p. 195.) In other words, where the resale of the purchased property is merely an incident of the activity of selling the taxpayer's product, it is not exempt as a sale made for purposes of resale. (*People* v. *Puritan Ice Co.* (1944) 24 Cal.2d 645, 651-652 [151 P.2d 1]; *Good Humor Co.* v. *State Board of Equal.* (1957) 152 Cal.App.2d 873, 879 [313 P.2d 640].)

It is clear Seven-Up's primary purpose in purchasing returnable containers is not to resell them, though it may eventually do just that; plaintiff is not in the business of selling such containers. To the contrary, Seven-Up is in the business of selling various beverages, and its primary purpose in purchasing the containers is to obtain a convenient and reusable means of purveying those beverages for sale to retailers. (See, e.g., *People* v. *Puritan Ice Co., supra,* 24 Cal.2d at p. 651.)

Notwithstanding Seven-Up's assertion, nothing in *Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918 [156 P.2d 1] mandates a contrary conclusion. In *Coca-Cola Co.,* the court considers only whether an amendment of the sales and use tax law changed or clarified the existing law. Originally, defendant's rule 10 construed the sales tax law as exempting the sale of nonreturnable containers to those placing contents in them to be sold with the container. Later, defendant changed its view and ruled nonreturnable containers were not exempt from taxation. (*Id.* at p. 922.) Thereafter, the Legislature enacted and then amended Revenue and Taxation Code section 6364 to its present form, specifically exempting such nonreturnable containers from taxation.

The court notes it is presumed the Legislature amends statutes with full awareness of the administrative construction given the law. Thus, when the Legislature makes a modification of a statute requiring an interpretation

contrary to administrative construction, this action is significant in ascertaining legislative intent. (*Coca-Cola Co.* v. *State Bd. of Equalization, supra,* 25 Cal.2d at p. 922.) The court then states: "Unquestionably because of controversies such as the one now before the court, . . . the Legislature amended the statute to expressly exempt . . . '[n]onreturnable containers when sold without the contents to persons who place the contents in the container and sell the contents together with the container . . . .' " (*Id.* at p. 923.) In view of this amendment in the midst of such controversy, the court concludes it is reasonable to "infer a legislative intent to clarify rather than change the existing law. [Citations.]" (*Ibid.*)

The case says nothing whatsoever about the nature of the use to which the plaintiff put the nonreturnable containers and nothing whatsoever about whether returnable containers are purchased for a primary purpose other than their resale. Accordingly, there is nothing in *Coca-Cola Co.* suggesting returnable containers have not been subjected to a taxable intervening use prior to their resale. Indeed, the plain language of Revenue and Taxation Code section 6364, subdivision (c), suggests returnable containers *are* put to a taxable intervening use after their initial purchase by the bottler and before their sale at retail. If there were no taxable intervening use, there would be no need to exempt from taxation the gross receipts from sales of returnable containers "when sold with the contents *in connection with a retail sale* of the contents" (*ibid.*, italics added), for at each step the sale of such containers would be exempt as a sale made for the purpose of resale. The exemption would be meaningless. (See *East Texas Oxygen Co.* v. *State, supra,* 681 S.W.2d at p. 745.)

In sum, it is clear Seven-Up did not purchase returnable bottles from the manufacturers for purposes of resale, but to use and reuse in presenting its product for resale. Moreover, because the bottles are reusable, they do not become a component of the product sold; they remain a separate, distinct device for purveying the product to the ultimate consumer. Subdivision (c) of Revenue and Taxation Code section 6364 does not exempt from taxation the manufacturer's original sale of returnable containers to the bottler. Since this is a specific statute of exemption, it must take precedence over the general exemption from taxation afforded to sales for resale. Accordingly, the manufacturer's original sale of the returnable bottles to the bottler is not exempt either under general sales and use tax law or under the returnable container exemption. It follows that the trial court did not err in entering judgment in favor of defendants.

That portion of the judgment ordering a refund of sales taxes to plaintiff Westinghouse Beverage Group, Inc., in case No. C498944 is reversed. That

portion of the judgment ordering that plaintiff Associated Beverage Company, Inc., take nothing in case No. C422313 is affirmed. Defendant is to recover costs on appeal.

Ortega, J., and Vogel, J., concurred.